**Thomas R. WICKWIRE, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. S–1138.**

Supreme Court of Alaska.

Sept. 19, 1986.

---

Richard H. Friedman, Royce, Wollenberg & Friedman, Sitka, for appellant.

William T. Council, Council & Crosby, Juneau, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

MOORE, Justice.

This appeal stems from the termination of Thomas R. Wickwire from his position as an assistant attorney general for the State of Alaska. Wickwire asserts that he was fired for speaking out on a matter of public concern and that his dismissal violated his rights to free speech and to petition the government under the state and federal constitutions. We conclude that the trial court properly rejected Wickwire's claim. We affirm the award of summary judgment to the State, but reverse the award of attorney's fees against Wickwire.

## I. FACTS AND PROCEDURAL HISTORY

Because resolution of this appeal requires a complete understanding of the facts, the events leading up to Wickwire's termination are set forth in detail.

Wickwire worked for the State as an assistant attorney general from 1970 until his firing in late 1982. In October 1980 Larry Wood was promoted to chief of the Attorney General's Fairbanks office, where Wickwire worked, and became Wickwire's immediate supervisor.

Soon after he took over, Wood requested an additional attorney be assigned to the Fairbanks office because of an overload of cases in the human services section. No attorney was added for several months, so Wood began assigning human services cases to lawyers in other sections. In May 1981 Wood assigned two children's proceedings to Wickwire, who normally did not handle such cases. Wickwire objected to the assignments because he was "not familiar with them" and was "too busy." In July, after refusing another case assignment, Wickwire wrote a memo to Wood expressing concern that his workload had become so heavy that it endangered his ability to handle his cases competently. Wickwire's memo stated in part:

> The point is the deadlines are coming up so frequently that I do not have time to reflect on the content. This totally defensive position is affecting the potential outcome of these cases. That is, I am forced into a malpractice position because I cannot pay attention to detail. I have overlooked some important details in the past several weeks despite working evenings and weekends....
>
> ... It is my duty to refuse work that I do not have time to handle diligently or without neglecting other work.

In a reply memo Wood stated in part:

> With regard to your caseload, the obvious reason I sat down with you recently was to make sure I had a good handle on what your situation is—and I found out. You have no more work to do than any of the rest of us.

Wickwire responded with a long memo in which he reiterated his caseload/malpractice concern. He stated in part:

> I do believe you are making some mistakes that until corrected are unnecessar-

ily risking the State's interests. I respect the authority I am under and will follow orders except when they conflict with the ethical obligation I owe to each client agency I represent or, of course, if the order were to do something illegal or immoral—the "Watergate" type order. When I refused to take the work comp case last week I did so only because to spend any time on it at all would have forced me to neglect cases already entrusted to me as well as the new case.

I recently reread [DR 6–101 & 6–102] of the Professional Canons....

In other words, I am not allowed to malpractice, even if the boss orders me to but, if I do, I am not allowed to try to squirm out of it by saying, for example, the boss ordered me to.

A few days later Wickwire left on a vacation. Upon his return, Wickwire received a memo from Wood detailing several problems that arose during Wickwire's absence, due to his failure to arrange to have his cases covered. Wood also criticized Wickwire for leaving on vacation without providing a telephone contact number as required by office policy. Wood further stated:

I sat down with you and carefully reviewed each and every one of your cases and concluded that you have no more a caseload than anyone of us in the office....

In short, I am satisfied that your workload should allow you to undertake even more cases, and if others are reassigned and refused, we, again, are going to have a real problem.

Wood indicated that he planned to send copies of their memos to Ronald Lorensen, the deputy attorney general in Juneau who was second in command of the Department of Law.

Wickwire responded with a memo stating in part:

Concerning the problems you had with my cases while I was on vacation, they were all small nuisance matters that I had no idea were my responsibility to eliminate in order to take a vacation. I was too busy with bigger problems to deal with them before I left. I cannot stop my cases while I take a vacation.

. . . .

If your being the boss authorizes you to order me to work more cases when I believe that will require me to neglect the cases I already have then I need to hear that from someone higher than you.

You recently ordered me to file a new unemployment tax collection case by a deadline that is right in the middle of trial preparation in a large, very active case. I am not going to do that.

During the next month, October 1981, Wickwire asked Wood for permission to take on what Wickwire termed a "full scale case" involving prosecution of foreign nationals for violation of Alaska fish and game laws. Wood initially refused because of Wickwire's previous workload complaints. When Wickwire persisted in his efforts to get the case, Wood subsequently agreed to assign it to him. Wickwire then requested, but was denied, permission to take an investigative trip to Belgium in connection with the case.

In November Wood sent Lorensen copies of the Wood-Wickwire memos concerning Wickwire's caseload. Lorensen read the materials, evaluated Wickwire's caseload and compared the caseloads of other department attorneys. Lorensen concluded that Wickwire "could in fact take on more work if he were willing to rearrange his own work priorities."

In December Lorensen wrote a memo to Wickwire emphasizing Wood's authority as office chief. The memo stated in part:

I have no doubt, based on reading the various memoranda, that you genuinely believe that your professional judgment and, perhaps, integrity are being attacked or, at least, questioned. While you may see it that way, I don't—and I don't believe Larry does either. It's really a question of authority: authority to set priorities and to reorder priorities when the need arises; authority to assign work and establish deadlines....

With respect to the work of the Fairbanks office, Larry has that authority....

....

... I don't lose my temper easily or often. I did not do so when going through the memos (despite some very insubordinate and ill considered language by you). But I have to admit that I came pretty darn close to doing so when, after reading over and over how you didn't have time available to make phone calls, read through worker's comp files ... or make sure that scheduled hearings are covered while you were on leave, I realized how you had set me up with the Fish and Wildlife commander to get Larry to assign you to handling the Belgian guide case. That happened after all your complaints about your workload and after Larry had already declined to assign it to you because you had too heavy a caseload. I fail to understand how you've got time to handle a difficult case like that when you can't seem to find the time to draft up a simple complaint in a straight-forward ESD collection case....

... Further, if any more of these incidents of your failing or refusing to accept Larry's authority arise, and particularly if Larry recommends that you be fired, you'll be out.

Wickwire answered Lorensen in a January 25, 1982 memo in which he reiterated his workload concern and belief that it was his professional obligation to raise the issue. This was the last time Wickwire mentioned his workload/malpractice concern in writing to his superiors. He stated, in part:

The point I disagree on is that I will not accept new work assignments when I am already malpracticing by neglect on major cases.... The decision on when I have surpassed my ability to handle more cases competently is mine as I regard a lawyer's duty not to malpractice as an ethical one that is nondelegable.

The memo war ceased for the next several months. In July Wickwire returned from a month-long vacation two days later than scheduled and, like the prior year, failed to call the office during his absence and also failed to make arrangements to have all his cases covered. Immediately after Wickwire returned, Wood called Lorensen and recommended that Wickwire be fired. Lorensen traveled to Fairbanks and met separately with Wood and Wickwire to discuss the basis for Wood's recommendation—that Wickwire had failed to cover his cases while on vacation, failed to call in as requested, and returned to work late.

In a letter dated August 4, 1982, Lorensen and Attorney General Wilson Condon informed Wickwire they had decided against termination, but were going to suspend him for 30 days, at a time to be selected by Wood to minimize disruption. The letter stated in part:

We want to make it crystal clear to you that you will be able to stay on with the Department of Law if, and only if, you are able to substantially improve your performance as an Assistant Attorney General in the Fairbanks office. We have both reviewed in detail Larry Wood's complaints about your performance, and in particular your continuing failure to make sure matters for which you are responsible are adequately covered when you are on leave and your unwillingness to accept the supervision and direction of the office chief in dealing with matters which are assigned to you.... If you are unable to accept the direction he gives, work on the problems and cases he specifically directs you to work on, and accept the priorities he establishes, then you will have to leave.

The letter also stated that for the next four months Wood was to make monthly reports on Wickwire's performance. Wood's first two reports indicated that he and Wickwire were getting along better and that there had been "no real problems." Wickwire's 30-day suspension began November 1.

On November 8 Wickwire responded to the Condon/Lorensen suspension letter by

sending a four-page letter to Condon.[1] This letter, which prompted Wickwire's firing, responded to several criticisms Wood had made of Wickwire's performance, including his failure to call the office and arrange cover for his cases while on vacation. Wickwire's letter concluded with the following four paragraphs:

> You have spent enough time with Larry and are quick to judge character. You must know what you have in Larry so I can only assume you are avoiding the problem. No matter what happens to me, the problems Larry causes will have to be dealt with. They will not just go away.
>
> If you were to grant everyone in the office immunity and ask them what they really think about how the Fairbanks office is run, you might learn something and get a new perspective on who and what the problem is. The morale is at an all time low.
>
> I place this 30-day suspension as well as the "we want to make it crystal clear to you ..." language in your letter in the same class as other threats I have received during my career. I believe threats have no place in legal judgments or matters of conscience. I am not going to do or think anything different if you threaten me than if you don't.
>
> I expect to hear from you as soon as possible.

Shortly after receiving the letter, the Attorney General decided to fire Wickwire. In a December 2 telephone conversation and a letter of the same date Condon informed Wickwire of his termination. Condon's letter stated in part:

> My reason for terminating you is that on the basis of the next to the last paragraph in your letter to me of November 8, 1982, I am convinced that there is no way we can effectively alter your attitude and performance in this office. Since discipline clearly will not work, I believe I have no choice except to terminate you.

In his deposition, Condon stated that he would "absolutely not" have fired Wickwire if he had not written the November 8 letter.

Wickwire filed a wrongful discharge suit, naming as defendants Condon, Lorensen, Wood and the State. The individual defendants subsequently were dropped from the suit. Wickwire's amended complaint set forth several claims, including a claim that his firing violated his constitutional rights to free speech and to petition the government. He sought damages on a breach-of-contract theory and by stating a claim for relief under 42 U.S.C. § 1983 (1982).

Ruling on cross-motions for summary judgment, the trial court granted summary judgment to the State on all of Wickwire's claims.[2] The court found that Wickwire was fired for insubordination—specifically, for the statements in the next-to-last paragraph of his November 8 letter—and that he had "not demonstrated any connection between his firing and his concern over malpracticing." The court awarded the State $70,945.81 in costs and attorney's fees. Wickwire appeals from the decision on his free speech and petition claim. He also challenges the fee award.

## II. DISCUSSION

The issue we must decide is whether Wickwire's firing violated his constitutional rights. Wickwire asserts that after writing the November 8 letter to Condon he was illegally terminated for exercising his free speech right protected by the first amendment to the United States Constitu-

---

1. Wickwire's November 8, 1982 letter is reproduced as an Appendix to this opinion.

2. In addition to the free speech and petition claim, Wickwire alleged he was fired in violation of public policy and the implied covenant of good faith and fair dealing contained in his employment contract. He also alleged the State unfairly conducted the investigation that led to his termination, in violation of his contract rights, article I, section 7 of the Alaska Constitution and AS 11.76.110. These claims are not at issue in this appeal.

tion,[3] made applicable to state action by the fourteenth amendment. He also claims a violation of the free speech and right to petition guarantees in the Alaska Constitution, art. I, §§ 5 and 6.[4] Wickwire contends the trial court should have granted his motion for summary judgment on these issues.

### A. *The first amendment claim*

■ We addressed the issue of termination of public employees for their exercise of first amendment rights in *State v. Haley*, 687 P.2d 305 (Alaska 1984). We held that implicit in every employment contract with the state is a promise not to terminate the employee for an unconstitutional reason. *Id.* at 318. Thus, if Wickwire's firing violated his first amendment free speech right, the state is liable for breach of his employment contract.

A three-pronged showing is required to establish that Wickwire's discharge violated his free speech right: 1) that he engaged in protected activity; 2) that this activity was a "substantial" or "motivating" factor in the decision to fire him; and 3) that the state has failed to demonstrate that he would have been fired even if the protected speech had not occurred. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, 484 (1977). The employee bears the burden of proving the first two criteria, while the employer must disprove the third. *Id.*

To determine what constitutes protected speech by a public employee, we have relied on the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Haley*, 687 P.2d at 311; *City & Borough of*

*Sitka v. Swanner*, 649 P.2d 940, 943 (Alaska 1982). This test "allows a government employer to limit the First Amendment rights of an employee only if it can demonstrate that its legitimate interest in promoting efficiency in its operation outweighs the interests of the employee in commenting upon matters of public concern." *Swanner*, 649 P.2d at 943, *citing Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817.

In balancing these interests, seven factors are considered, including whether the speech has an impact on the government's operation and on the employee's daily job performance, and whether the speech addresses an issue of legitimate public concern. *Haley*, 687 P.2d at 311. The latter factor is a threshold requirement. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708, 719 (1983). If an employee's speech does not relate to a "matter of political, social or other concern to the community," the court need not scrutinize the reason for the discharge.[5] *Id.*

The Supreme Court addressed the "public concern" criteria in *Connick*, which involved the firing of an assistant district attorney who had objected to a transfer to a different section because she claimed she would have a conflict of interest. She was fired after she circulated a questionnaire asking co-workers for their views on office morale, office transfer policy, the need for a grievance committee, the level of confidence and trust in certain supervisors, and whether employees felt pressured to work in political campaigns. 461 U.S. at 141, 103 S.Ct. at 1686, 75 L.Ed.2d at 716. Only the latter question regarding political campaigns was held to raise a matter of public

---

**3.** U.S.Const. amend. I provides in part:
Congress shall make no law ... abridging the freedom of speech....

**4.** Alaska Const. art. I, § 5 provides:
Freedom of Speech.
Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.
Alaska Const. art. I, § 6 provides:
Assembly; Petition.

The right of the people peaceably to assemble, and to petition the government shall never be abridged.

**5.** The determination whether speech raises a matter of public concern and, ultimately, whether it is protected under the balancing test are questions of law. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7, 75 L.Ed.2d at 720 n. 7; *Haley*, 687 P.2d at 313 n. 5.

concern. *Id.* at 149, 103 S.Ct. at 1689, 75 L.Ed.2d at 721. The Court found the remaining issues to be matters of personal concern that were "mere extensions of [plaintiff's] dispute over her transfer" and not of public importance. *Id.* at 148, 103 S.Ct. at 1690, 75 L.Ed.2d at 720–21.

We turn now to Wickwire's free speech claim. It is undisputed that Wickwire was terminated for writing the November 8 letter to Condon. More specifically, Condon stated in his letter terminating Wickwire that he fired him because of the next-to-last paragraph in the November 8 letter.[6]

Wickwire's argument that his firing was illegal is based on the premise—rejected by the trial court—that his November 8 letter addressed three issues of public concern: 1) that Wickwire faced the possibility of malpracticing and violating the Code of Professional Responsibility due to his heavy caseload; 2) that he was ethically obligated to refuse additional cases if he believed they would cause him to violate the Code; and 3) that serious problems existed in the Fairbanks office caused by supervisor Wood. Wickwire essentially argues that protected speech was a substantial factor in the termination decision. We disagree.

We first consider Wickwire's claim that the letter addressed his concerns about malpracticing and violating legal ethics due to a heavy caseload. These issues are not expressly mentioned. Wickwire asserts, however, that the letter impliedly raised these issues when viewed in the context of the chain of correspondence between Wickwire and his superiors. We reject this argument, for the following reasons.

First, Wickwire's own deposition testimony indicated he had not thought that he was malpracticing due to a case overload for nearly a year prior to writing the November 8 letter. He testified that he would not have requested assignment of

the Belgian guide case "unless at the time I thought that the cases I already had were at a manageable level." The last time he had even mentioned the malpractice issue in writing to one of his superiors was January 1982, nearly ten months before his November letter. When Wickwire met with Lorensen in July 1982 to discuss Wood's recommendation that he be fired, Wickwire did not bring up his caseload/malpractice concern, nor did he send any memos or complain to his superiors about malpracticing or violating the Code during August, September or October 1982. Given these facts, it seems clear that Wickwire's malpractice argument had ceased to be an issue in Wickwire's dispute with his superiors.

We note that Wickwire first raised his caseload/malpractice concern in writing to his superiors in July 1981. During the period from July to November 1981 his supervisors discussed this concern with him and both Wood and Lorensen separately analyzed his caseload in comparison with the caseloads of other attorneys in the department. Both concluded that he was not overloaded. In view of Wickwire's silence on the subject after his January 1982 memo, it was reasonable for his superiors to believe the caseload/malpractice issue had been laid to rest.

Finally, Wickwire's November 8 letter was a response to the Condon/Lorensen August 4 suspension letter, which made no mention of the caseload/malpractice issue. Both letters dealt primarily with the reasons for Wickwire's suspension—his failure, for the second year, to have his cases covered and to call the office while on vacation, his tardy return from vacation, and his unwillingness to accept Wood's authority as a supervisor.

For these reasons, we reject Wickwire's contention that his November 8 letter impliedly addressed an issue which by all out-

---

6. Condon stated in the termination letter that the firing was necessary because he believed the next-to-last paragraph of Wickwire's November 8 letter showed that the effort to discipline Wickwire had not worked and that Wickwire was not going to improve his job performance as he had been directed to do. In his deposition, Condon reiterated this reason for firing Wickwire.

ward appearances he had abandoned months earlier. We conclude that the trial court correctly found there was no genuine issue of material fact regarding whether Wickwire was fired for communicating his concern about malpractice.

Regarding Wickwire's concern about problems in the Fairbanks office caused by Wood, we agree that his letter raised this issue. Given the facts of this case, however, and the essentially personal nature of Wickwire's employment dispute with Wood, we conclude this issue did not rise to the level of being a matter of public concern. Wickwire's situation is distinguishable from two recent cases in which we ruled for employees who were fired for speaking out on matters of public concern.

In *Swanner*, 649 P.2d 940, a police captain was fired for signing two letters—one signed by all patrol officers and one signed by all members of the department except the police chief—that were sent to several local officials. The letters complained about the safety of a patrol vehicle and expressed dissatisfaction with continual changes in department policies and a lack of organization. *Id.* at 942. Such concerns obviously did not relate to a personal dispute between a single employee and his supervisor. Rather, the letters reflected a difference of opinion between all members of the department and the chief, which was "a matter ... clearly of general public interest." *Id.* at 944.

In *Haley*, 687 P.2d 305, a legislative research assistant was fired after she expressed views, during a television interview, criticizing the presence of multinational corporations in Alaska. There is no question but that such an issue is of public concern. We specifically distinguished the speech in *Haley*, which "focused entirely on public issues as distinct from personal ones," from that in *Connick*, which involved "internal office matters" and speech that "primarily concerned matters of personal interest to the employee." *Id.* at 314 n. 6.

In contrast, Wickwire's situation is analogous to that in *Connick* for two reasons.

First, like the office questionnaire in *Connick*, Wickwire's letter referred to "problems" caused by Wood but did not specify details or seek to bring to light actual or potential wrongdoing or breach of public trust on Wood's part. *See Connick*, 461 U.S. at 148, 103 S.Ct. at 1690, 75 L.Ed.2d at 721. Second, as the trial court correctly found, Wickwire's complaint essentially related to a personal dispute with his supervisor, similar to the situation in *Connick*. While the dispute initially involved Wickwire's caseload/malpractice concern, it developed into a conflict between Wickwire and Wood over internal office management and Wood's authority to run the Fairbanks office and give Wickwire directions. This was made clear when Wickwire returned from vacation in August 1982 and Wood immediately recommended his firing because Wickwire had returned late and, for the second consecutive year, had failed to follow Wood's directions to cover his cases and leave a telephone contact number or call in while on vacation.

Wickwire's letter to Condon responded to these and other complaints made by Wood about Wickwire's job performance. With the exception of a single statement that "[office] morale is at an all time low," Wickwire's four-page letter discussed matters of personal interest to him and responded to specific allegations of unsatisfactory job performance. We are not prepared to say that this letter raises a matter of legitimate public concern. As the Court stated in *Connick:*

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147, 103 S.Ct. at 1690, 75 L.Ed.2d at 720.

We do not suggest, nor do we read *Connick* as so holding, that an employee's com-

plaint about a supervisor never could raise an issue of public concern. *See id.* at 148 n. 8, 103 S.Ct. at 1691 n. 8, 75 L.Ed.2d at 721 n. 8. However, we conclude that Wickwire's expression of concern about problems in the Fairbanks office caused by Wood reflected merely a personal, internal office dispute which did not raise a matter of legitimate public interest.

Because the letter for which Wickwire was fired did not address a matter of public concern, the trial court properly ruled that his first amendment right to free speech was not violated.

### B. *The state constitution claim*

■ Wickwire also asserts that the firing violated his rights to free speech and to petition the government under the Alaska Constitution, art. I, §§ 5 and 6.[7] He urges us to interpret our constitution as affording more protection to the free speech rights of public employees than the Supreme Court has allowed.

We previously have applied the *Pickering* balancing test to address illegal firing claims brought under the state constitution. *See, e.g., Haley,* 687 P.2d at 311–12. Although we see no reason to alter this approach, we believe it appropriate to construe the "public concern" criteria broadly to encompass speech on a wide range of subjects. From a public policy standpoint, it makes sense to encourage employee speech about the operations of government since employees often are in the best position to offer informed opinions. Our reading of *Connick* suggests that there may be instances where we would find that certain speech addressed a matter of public concern and was protected under Alaska's Constitution even though a federal claim might yield a contrary result. However, this is not such a case. Even interpreting

the public concern requirement liberally, we conclude that Wickwire's statement regarding problems caused by Wood did not address a matter of public interest.

In summary, we hold that Wickwire's firing for writing the November 8 letter to Condon did not violate his right of free expression under either the federal or state constitutions. The trial court's award of summary judgment to the State was proper.

### C. *Attorney's Fees*

The trial court awarded $70,845.81 in costs and attorney's fees to the State. Wickwire challenges this award on grounds that 1) the trial court abused its discretion in awarding full, rather than partial, fees and 2) the number of hours claimed by the State's attorneys was excessive.

In November 1984 the State made Wickwire a $50,000 offer of judgment, pursuant to Alaska Civil Rule 68, which he rejected. In March 1985 the parties signed a stipulation dismissing the individual defendants and providing for each side to pay its own attorney's fees. The State subsequently won summary judgment on all of Wickwire's claims and moved for attorney's fees and costs pursuant to Civil Rules 68 and 82. During oral argument counsel indicated that the State had incurred $73,316.50 in *total* attorney's fees, of which $64,641 were incurred *after* the offer of judgment. No mention was made of the stipulation or whether the $64,641 included fees incurred representing the individual defendants.

The court ruled that the State was entitled to full fees incurred after the offer of judgment, and awarded the State $64,641 in attorney's fees, plus costs. The court subsequently entered a $70,945.81 judg-

---

7. We do not analyze Wickwire's right to petition claim separately from his free speech claim. We recently held, in the slightly different context of a libel action, that Alaska's Constitution provides no greater protection to speech because it is contained in a petition to government officials rather than expressed in another manner. *Doe v. Superior Court,* 721 P.2d 617, 627–

28 (Alaska 1986). *See also McDonald v. Smith,* 472 U.S. ——, ——, 105 S.Ct. 2787, 2789–91, 86 L.Ed.2d 384, 388–90 (1985) (refusing to elevate the petition clause to special first amendment status by granting greater constitutional protection to a petition than other types of protected speech).

ment against Wickwire for costs and attorney's fees.[8]

The award of full fees was erroneous. A defendant who ultimately fares better than its Rule 68 offer is entitled only to *partial* compensation for post-offer attorney's fees. *Truckweld Equipment Co. v. Swenson Trucking & Excavating, Inc.,* 649 P.2d 234, 240 (Alaska 1982); *Farnsworth v. Steiner,* 601 P.2d 266, 272 (Alaska 1979). We therefore reverse the award and direct the court, on remand, to award only partial fees and to take into account the stipulation regarding fees incurred in representing the individual defendants.[9]

Wickwire also contends the award should be reduced because the 628 hours claimed by the State's counsel was excessive when compared to the 344 hours spent by Wickwire's attorney and his assistants. In view of the broad discretion accorded trial courts to determine fee awards, we cannot say that this comparison alone mandates a reduction in the number of hours for which the State is compensated. However, the trial court considered an improper factor when it determined the fee award. In its oral decision the court suggested that the State had incurred additional expenses because Wickwire chose to sue several individual defendants as well as the State. Since the stipulation dismissing the individual defendants provided that each side would pay its attorney's fees, it was improper for the court to consider this factor in deciding whether the State's fee request was reasonable.

On remand, when the court recalculates a partial fee award it should disregard Wickwire's decision to name individual defendants.

The superior court's award of summary judgment is AFFIRMED. The attorney fee award is REVERSED and REMANDED.

### APPENDIX

908 Smythe
Fairbanks, AK 99701
November 8, 1982

Wilson Condon
Attorney General
Pouch K—State Capitol
Juneau, AK 99811

Dear Wil:

This is in response to your August 4, 1982 letter. I did not intend to wait this long to answer, but I did intend to wait several weeks to see if there was any way I could let it pass. I find I cannot.

You stated that I must substantially improve my "performance as an Assistant Attorney General in the Fairbanks Office" and that Larry Wood's complaints about my performance are, with minor exceptions, absolutely legitimate.

Please state what you mean by "performance." Except for seeing that matters are covered while I am on leave, which I respond to here, I don't understand the charge, particularly if it includes my case work as opposed to how I get along with Larry Wood. I have asked you to look at my case work and tell me if the quantity or quality has declined. Since you have not responded, I assume you have not done so.

Which matters were not adequately covered while I was on leave? If you will tell

---

**8.** It is not clear from the record whether the amount awarded beyond $64,641 constituted costs alone or costs and attorney's fees incurred prior to the offer of judgment.

**9.** We reject the State's argument that it is entitled to full attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, as recently construed in *Marek v. Chesny,* — U.S. —, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). The federal statute authorizes courts to award attorney's fees and costs to prevailing parties in suits brought under certain civil rights

statutes, including 42 U.S.C. § 1983. While Wickwire's amended complaint against the State and the three individual defendants included a § 1983 claim, Wickwire subsequently agreed to dismiss the individual defendants, with each side to bear its own costs and attorney's fees. The only remaining defendant was the State. Since the State is not a "person" within the meaning of § 1983 and may not be sued in a § 1983 action, *State v. Green,* 633 P.2d 1381, 1382 (Alaska 1981), the federal fee award statute is not applicable to this case.

me what the criticisms are, I will have notice. Then, if I can respond to someone who will decide the issues after he hears my side, I will have due process, which I believe is my right. At this point, I believe my suspension and the placement of that letter in my personnel file are illegal acts, the latter of which could drastically affect my career.

Please also state what you mean by my *continuing* failure. When did it start? What were the other matters? Were they mentioned in my prior evaluations?

Predictably, all my cases have not been dormant while I was on leave. Several of them usually come to life while I am gone.

I will guess at the cases you may be referring to in your remark about my *continuing failure* to adequately cover matters while away from the office on leave.

Are you referring to a matter which arose during my last year's vacation at Christmas time? There was a problem getting a Supreme Court brief filed as a stipulation for extention of time had to be modified after opposing counsel left town. The Court required a motion stating the terms of the stipulation and reason why the time was needed. The next working day after I left, I called the office, spoke to Niesje (Larry was out of town also) and asked her to follow it through. She did so, and when I returned to work, Larry told me she was mad at me for leaving without getting the brief filed first. Niesje, however, never mentioned it to me.

I thought it would be alright to leave on my trip and ask for maybe 30 minutes' worth of help in getting the brief filed, but evidently Larry did not think so.

Are you referring to matters that arose during this summer's vacation? The first thing Larry said to me when I returned was that he wanted to fire me for not calling in and returning a day later than I had said. As far as I know, all of the matters that Larry had to work on while I was gone, I had resolved by my second day back. None of them were emergencies; none cost the state anything.

Concerning his order to call in twice a week while on vacation, he issued that order during a two-hour stint I put in the office on June 24, a Thursday, after seven hours sleep since Monday morning and a plane crash the day before. During this two hours in the office I was on vacation. I had come in to check my mail for emergencies. At that time, not only did he tell me to call in twice a week thereafter, he also insisted that I go through all of the four-inch high stack of mail and pleadings that had come in during my absence. I complied.

Concerning what I would have to have done to call in twice a week—and I told Ron Lorenson this when we talked in late July but evidently it did not pursuade him—I was living at a fishing camp about 30 miles up the Yukon River from Emmonak where the nearest phone is located—a pay phone in a community building that is open only on some irregular schedule. I did not have a reason to go to Emmonak twice a week and when I did go the "phone building" was often closed. It is at least a four-hour round trip to town and when I went it was usually on little sleep. It is an expensive, unpleasant and risky trip. I called my family not more than once a week.

In these circumstances, I was not going to call Larry twice a week just to see if he had some work for me. I was sure there was work there for me as there always is, but there were no emergencies relayed to me from other calls Gary Foster and I made to our families and Gary made to the office. If Larry had wanted to, he could have gotten a message to me about any problems with my cases by just telling Gary Foster what it was and that he needed to hear from me. But the only message I ever got was that Larry wanted to know where I was. Since he already knew I was with Gary, I did not see a need to call. Under these circumstances, one of us calling in was enough. It is apparent to me that Larry did not want any particular information or assistance, just frequent checking in. While I have done that during

other vacations when necessary, it would have been very inconvenient on this vacation. That is why I took the vacation—to get away from it, especially the phone. I will not work during my vacation when there is no urgent need. I do not think Larry can impose that as a condition to taking vacation. I am surprised that Ron Lorensen, with experience in Labor Law, apparently thinks so. If I am wrong, please prove it.

Other than the above, I do not know what you are referring to when you say I am stubborn. I suspect you may be referring to several cases that I was ordered to drop, about which I would like my personnel file to contain a little more. If not, tell me what incidents you are referring to so I may respond.

I challenge the sentence where you say my stubborn nature must not get in the way of the proper performance of this department's obligations to client agencies or the public. Which client agencies have complained about my performance? Who in "the public"—not adversaries—has complained about my performance? Nothing in 12 years with this department has ever come close to equalling Larry Wood for getting in the way of the performance of my obligations to client agencies and the public. Most of the time, I do my job in spite of him, not with his assistance.

Larry has told me my 30-day suspension without pay starts November 1. I do not think this suspension or the findings in your letter and its placement in my personnel file are legal or justified by anything I have done.

When responding, please tell me what you think I expect to gain by this dispute—what are my motives. Doesn't it raise any suspicions when I tell you I don't want any other job; I don't want more money; I don't want to run the office; I don't want anything except to be able to do a good job on the cases? Would you trust me more if I were an empire builder or trying to feed my ego by crushing the people I work with?

You have spent enough time with Larry and are quick to judge character. You must know what you have in Larry so I can only assume you are avoiding the problem. No matter what happens to me, the problems Larry causes will have to be dealt with. They will not just go away.

If you were to grant everyone in the office immunity and ask them what they really think about how the Fairbanks office is run, you might learn something and get a new perspective on who and what the problem is. The morale is at an all time low.

I place this 30-day suspension as well as the "we want to make it crystal clear to you ..." language in your letter in the same class as other threats I have received during my career. I believe threats have no place in legal judgments or matters of conscience. I am not going to do or think anything different if you threaten me than if you don't.

I expect to hear from you as soon as possible.

Sincerely,
/s/ Thomas R. Wickwire
Thomas R. Wickwire

P.S. (handwritten) This was typed out of the office discretely. Larry, nor anyone else has a copy.

BURKE, Justice, concurring.

I concur in the result.