**Daryl METHVIN, Appellant,**

v.

**Robert BARTHOLOMEW, Kenneth Langel, James Johnsen, John Does I through V, individually and in their official capacities representing the State of Alaska, and State of Alaska, Appellees.**

No. S–8094.

Supreme Court of Alaska.

Dec. 4, 1998.

Rehearing Denied Feb. 17, 1999.

Marshall K. Coryell, Coryell & Associates, Anchorage, for Appellant.

Douglas S. Parker and Michael A. Grisham, Bogle & Gates, P.L.L.C., Anchorage, for Appellees.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE and BRYNER, Justices.

*OPINION*

FABE, Justice.

## I. *INTRODUCTION*

In this appeal we consider Daryl Methvin's claim that the State fired him for sending letters that were critical of his supervisors to the Governor and Lieutenant Governor. The superior court granted summary judgment against Methvin, notwithstanding Methvin's contention that the letters constituted protected, "whistle-blowing" activity. Because we conclude that Methvin's letters of complaint primarily addressed his personal conflicts with his supervisors and did not discuss issues of public concern, we affirm the superior court's order.

## II. *FACTS AND PROCEEDINGS*

For almost ten years, Daryl Methvin worked for the State Department of Transportation and Public Facilities (DOTPF) in the Statewide Equipment Fleet (SEF), a division that procures and maintains vehicles and road maintenance equipment used in DOTPF's work. Methvin started as an Equipment Operations Analyst, preparing bid documents and reviewing bids, and he moved up through the ranks to become the statewide manager of SEF. But because he disagreed with a decision to reorganize SEF, he resigned his managerial position in 1988 and resumed his work as an Equipment Operations Analyst for SEF in Anchorage.

In 1989 DOTPF appointed Kenneth Langel as the new SEF manager; Langel reported to Bob Bartholomew. Formerly Methvin's subordinates, Langel and Bartholomew now served as his supervisors. From the outset, tension existed in their working relationships with Methvin. Methvin considered himself more experienced than Langel in the field of public procurement and public fleet management, while Langel viewed Methvin as having "a combative attitude." When Methvin began to air his complaints about new SEF policies to the vendor community, Langel warned him that although he had "no problem" with Methvin expressing his views within SEF, Langel would not permit him to share his objections to SEF policy with its customers and vendors.

Although the friction between Langel and Methvin was apparent as early as February 1989, when Methvin received an "Unacceptable" rating in "Interpersonal Relationships" on his annual evaluation, the problems escalated. By the end of 1989, some vendors began to comment on Methvin's "personal war against SEF [headquarters]." When Langel attempted to critique various aspects of Methvin's technical writing, Methvin complained that the criticism consisted of "derogatory comments and slurs." Although Lan-

gel also complimented Methvin on the extra effort Methvin had put forth in completing bid reviews on a short deadline, Methvin's frustration with his supervisors grew.

In the spring of 1991, Langel became concerned about a breach of confidentiality that allegedly occurred during Methvin's review of bid documents. Langel accused Methvin of telling one bidding vendor that another bidder had failed to sign its bid documents. Methvin responded to this accusation by encouraging vendors to write letters to SEF management expressing their confidence that these charges were "untrue" and "absurd."

Langel reprimanded Methvin in a "letter of warning" that cautioned him against engaging in "inappropriate communication with vendors or any others outside SEF Headquarters staff relative to bid information during the review process." Methvin countered by writing to Lieutenant Governor Jack Coghill on May 3, 1991. In his letter, Methvin complained about his supervisors' actions and threatened "litigation for damages against the Agency, and individuals involved," if the warning letters were not removed from his personnel file. Cautioning that such a lawsuit could cost the State "millions of dollars," he closed his letter by questioning why Langel and Bartholomew were still employed by the State.

Methvin also responded directly to Langel in a memorandum, accusing Langel of procurement violations and of a desire to cover up procurement problems to hide them from the public. In this memo, Methvin blamed Langel for lowering SEF to its "worst condition" in years due to a "lack of management." Methvin then accused Langel of exhibiting "bizarre behavior," and being a "political appointee" who lacked fleet management and procurement experience.

Langel responded by sending Methvin a second letter of warning. He characterized Methvin's memo as an "improper communication" and demanded that Methvin document his allegations of procurement violations and cover-up, admonishing him that "[a]bsent documentation, these allegations appear to constitute no more than an unacceptable response to supervisory direction and a poor attitude and disloyalty toward your employer."

The day after receiving this letter, Methvin took his dispute with Langel to Governor Walter J. Hickel, complaining in a letter of "continued program mis-management," objecting to his supervisor's decision to move SEF headquarters from Juneau to Anchorage, and exhorting the Governor to "appoint new management." A few days later, Methvin responded to Langel in a sarcastic manner: "If you, and your team wish to have some type of mis-guided loyalty I suggest each of you buy a dog." Methvin also suggested that Langel write himself a warning letter.

Shortly after receiving this memo from Methvin, Langel was advised that Methvin had been encouraging members of the vendor community to write to the Governor to request that SEF be moved and that Langel and Bartholomew be fired and replaced. Methvin denied doing this and presented to the court an affidavit of a vendor who took responsibility for the letter writing campaign.

Langel then appointed James Johnsen, a DOTPF labor relations analyst, to investigate allegations of Methvin's insubordination in his continued communication with vendors. After reviewing the results of that investigation, Langel terminated Methvin. In the termination letter, he gave Methvin three reasons for the discharge: gross insubordination by engaging in improper contacts with vendors; dishonesty during the investigation in denying these contacts; and an unacceptable attitude. Langel charged Methvin with damaging SEF's relationship with the vendor community: "At worst, it would appear that you engaged in outright sabotage; at best, your actions reflect fundamental disloyalty to your employer which makes you incapable of performing your assigned duties."

After filing and partially pursuing a grievance through his collective bargaining representative, Methvin filed suit against Langel, Bartholomew, Johnsen, and the State, alleging violations of Alaska's Whistleblower Act, wrongful termination, breach of the implied covenant of good faith and fair dealing, and constitutional violations of his right to free speech. The superior court granted the de-

fendants' motion for summary judgment, finding first that "absent a pretextual motive for Plaintiff's termination, the requirements for a 'just cause' termination ... have been satisfied." The court then reasoned "that the differences existing between Plaintiff and the Defendants were personal in nature and that Plaintiff's termination was not for any pretextual reasons." Methvin appeals.

## III. *STANDARD OF REVIEW*

We review a decision to grant summary judgment de novo,[1] deciding "whether any genuine issue of material fact exists and whether on the established facts the moving party is entitled to judgment as a matter of law."[2] The moving party "has the entire burden of proving that his opponent's case has no merit."[3] When determining whether a genuine issue of material fact exists, we draw all reasonable inferences in favor of the non-moving party.[4]

## IV. *DISCUSSION*

Methvin has characterized the "fundamental issue" presented to this court as whether he "presented reasonable evidence that he was dismissed for 'Whistleblower' activity, including writing a letter to the Governor of Alaska alleging mismanagement and misconduct by [his] superiors." To resolve whether Methvin proffered sufficient evidence to prevent summary judgment on his claim that he was fired for constitutionally protected speech, we apply the three-pronged analysis described in *Bishop v. Municipality of Anchorage.*[5] Under this analysis,

[t]he plaintiff must show that (1)(s)he engaged in protected activity, and (2) the

activity was a "substantial" or "motivating factor" in the termination. This *prima facie* case can be rebutted, however, if (3) the employer demonstrates that the plaintiff would have been discharged even if the protected activity had not occurred.[6]

■ In its decision on summary judgment, the superior court was apparently persuaded by the State's argument on the third *Bishop* factor, concluding that Methvin's "insubordinate conduct suggests to this court that Plaintiff was going to be terminated." But we need not reach this question unless Methvin's speech was both protected and a substantial factor in his firing. Although Methvin has certainly raised a genuine factual issue as to whether his letters were a motivating factor in his termination—particularly since investigator Johnsen later admitted under oath that the letters to the Governor's office were one of the reasons Methvin was terminated—Methvin must first demonstrate that, in writing the letters, he engaged in protected activity. We conclude that he did not.

■ Methvin argues that he was fired for writing letters of complaint to the Governor and Lieutenant Governor, speech that he claims is protected by the First Amendment[7] and the Whistleblower Act.[8] Methvin is correct in his assertion that the State may not fire a public employee for exercising the right to free speech protected by the First Amendment to the United States Constitution.[9] This is because "implicit in [a] contract of employment [is] the State's promise not to terminate [the employee] for an unconstitutional reason."[10]

1. *See Howell v. Ketchikan Pulp Co.,* 943 P.2d 1205, 1207 (Alaska 1997).

2. *Nielson v. Benton,* 903 P.2d 1049, 1051–52 (Alaska 1995).

3. *Williams v. Municipality of Anchorage,* 633 P.2d 248, 250 (Alaska 1981) (quoting *Nizinski v. Golden Valley Electric Ass'n, Inc.,* 509 P.2d 280, 283 (Alaska 1973)).

4. *See Bishop v. Municipality of Anchorage,* 899 P.2d 149, 153 (Alaska 1995).

5. 899 P.2d 149 (Alaska 1995).

6. *Id.* at 154.

7. Article I, section 5 of the Alaska Constitution provides:

   **Freedom of Speech.** Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

8. AS 39.90.100–.150.

9. *See State v. Haley,* 687 P.2d 305, 318 (Alaska 1984).

10. *Id.*

We held in *Wickwire v. State* [11] that in determining whether speech by a public employee is protected by the First Amendment, we must first address the question of "whether the speech addresses an issue of legitimate public concern." [12] This "factor is a threshold requirement"; [13] thus, "[i]f an employee's speech does not relate to a 'matter of political, social or other concern to the community,' the court need not scrutinize the reason for the discharge." [14] Where the subject of an employee's speech involves "matters of personal concern" that are "mere extensions" of a dispute with a supervisor, such speech is not of public importance.[15]

This case is similar in many respects to *Wickwire*, in which an assistant attorney general wrote to the Attorney General complaining that the Fairbanks office was poorly run and detailing the problems he was having with his office supervisor.[16] Wickwire was fired as a result of statements made and the attitude expressed in this letter. He sued the State, claiming that his firing violated his constitutional rights to free speech and to petition the government.[17] We rejected Wickwire's contention that his letter addressed a matter of public concern, "conclud[ing] that Wickwire's expression of concern about problems in the Fairbanks office caused by [his supervisor] reflected merely a personal, internal office dispute which did not raise a matter of legitimate public interest." [18] We noted that although Wickwire's letter referred in general terms to "problems" caused by his supervisor, it did not "specify details or seek to bring to light actual or potential wrongdoing or breach of public trust on [the supervisor's] part." [19]

Like Wickwire, Methvin made only general allegations in his May 30, 1991 letter to Governor Hickel, complaining of "program mis-management," and charging that the SEF headquarters was being moved to Anchorage "because its [sic] been totally mismanaged." The letter contained no specific details of wrongdoing or any breach of the public trust by Langel or Bartholomew. Instead, Methvin once again requested that the Governor replace his supervisors: "Suggest you appoint new management, or cancel the relocation." Just a few days after writing this letter to the Governor, Methvin again wrote to Langel, suggesting "[i]f you, and your team wish to have some type of misguided loyalty I suggest each of you buy a dog." He continued, "I am employeed [sic] by the State of Alaska. You, and your team employ no one."

The State contends that "the hostility toward his supervisors apparent in Methvin's speech, the vagueness of his allegations and the fact that his speech was made in the context of a campaign to have his superiors dismissed all indicate that the issues Methvin raised [in the letter to Governor Hickel] were matters of personal, rather than public, concern." We agree. The tone, content, timing, and context of Methvin's letter to Governor Hickel lead to the conclusion that it was intended to address his escalating dispute with his supervisors and his ongoing campaign to have his supervisors fired. As in *Wickwire*, the concerns expressed by Methvin involved an internal office dispute regarding the exercise of supervisory authority and did not raise an issue of legitimate public concern implicating Methvin's right to free speech. Because the defendants did not violate Methvin's First Amendment rights, we affirm the superior court's decision to grant summary judgment in favor of the State on this ground.

11. 725 P.2d 695 (Alaska 1986).

12. *Id.* at 700. We review de novo the question of whether an employee's speech raises a matter of public concern. *See id.* at n. 5.

13. *Wickwire*, 725 P.2d at 700 (citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

14. *Id.* (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684).

15. *Id.* at 701 (quoting *Connick*, 461 U.S. at 148, 103 S.Ct. 1684).

16. *See id.* at 696.

17. *See id.* at 699.

18. *Id.* at 703.

19. *Id.* at 702.

**156**

## V. *CONCLUSION*

Because we conclude that Methvin's letters to the Governor and Lieutenant Governor did not raise issues of public concern, and thus did not implicate First Amendment protections, we AFFIRM the superior court's decision to grant summary judgment against Methvin.

COMPTON, Justice, not participating.