Stanley A. BISHOP, Appellant,

v.

MUNICIPALITY OF ANCHORAGE
and Anchorage Telephone
Utility, Appellees.

No. S–5988.

Supreme Court of Alaska.

July 28, 1995.

Rehearing Denied Aug. 18, 1995.

Edgar Paul Boyko, Edgar Paul Boyko and Associates, Anchorage, for appellant.

Donald C. Ellis, Kemppel, Huffman and Ginder, P.C., Anchorage, for appellees.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

### OPINION

MOORE, Chief Justice.

### I. INTRODUCTION

In this wrongful discharge case, Stanley Bishop appeals the superior court's grant of summary judgment in favor of his employer on all counts of the complaint. We affirm.

### II. FACTS AND PROCEEDINGS

Stanley Bishop worked for fourteen years at the Anchorage Telephone Utility (ATU), which is owned by the Municipality of Anchorage. Bishop was known as a "good employee" with an employment record free of disciplinary problems. On July 30, 1990, however, he was terminated for gross insubordination. He filed suit asserting tort, contract, and constitutional claims against ATU.[1]

Bishop claims that the first events relevant to his termination occurred approximately ten months before his dismissal. In late September 1989 Bishop wrote letters to the editors of the *Anchorage Daily News* and the *Anchorage Times*. The letters, which were published in early October, contained strong criticisms of the management of ATU and advocated the public sale of the utility.

After the publication of the letters, Bishop was summoned to a conference in the office of Dale Merrell, ATU's general manager. With top management personnel and a union steward in attendance, Merrell angrily questioned Bishop regarding the contents of the letter. Merrell was most upset about a passage which appeared to accuse him of misap-

---

1. Bishop also sued his union, the International Brotherhood of Electrical Workers, for failing to take his discharge to arbitration. The claim against the union, however, was eventually voluntarily dismissed.

propriation of ATU resources. Bishop was unapologetic about the views he expressed in the letter, but he did explain that the passage Merrell was most angry about was actually a criticism of past general managers. This seemed to satisfy Merrell somewhat, although he would later comment that he "could have fired" Bishop over the letter. Bishop claims that his work environment thereafter "became quite hostile," and that this hostility was the motivating cause behind his termination.

The events immediately preceding Bishop's termination involved a dispute over conditions at Bishop's work station. In September 1989 Bishop assumed new duties at ATU and began working in the repair service center as a testboard technician. Bishop was placed at a four-desk "pod" of computer terminals. In March of 1990, he began to complain that sunlight coming through a nearby window was causing a glare on his screen, resulting in eye irritation, headaches, and an inability to work efficiently.

Bishop claims that he asked his foreman for permission to acquire and install, at his own expense, a light-filtering screen for the window. The foreman, David Delaney, testified that he submitted a work order requesting glare reduction. Nothing transpired for several months, however, and in late July Delaney told Bishop that ATU maintenance had decided not to install any tinting.

Management personnel proposed several alternatives to window tinting, but none of these resolved the problem to Bishop's satisfaction. Drawing the shades was rejected by Bishop because it did not sufficiently halt the glare, and because it was unacceptable to some of his fellow employees. Bishop also deemed the placement of a filter over the computer screen to be ineffective.

Ultimately, management's solution to the problem was for Bishop to change work stations with a co-worker in the same pod. A worker named Larry Taylor purportedly volunteered to switch positions with Bishop, although Bishop claims that Taylor privately expressed his opposition to the switch. Bishop disapproved of the move, stating that it would not solve the problem, but merely shift the nuisance to another employee.

On Thursday, July 26, foreman Delaney told Bishop that Delaney "had been told to move" Bishop into Taylor's position. Bishop remained at his station, and complained to the acting shop steward about the problem.

On Friday morning, July 27, Bishop was called from his work station to a meeting attended by Delaney; Riley Blair, Delaney's supervisor; Mel Ackerman, the head of the personnel department; and Carla Rehm, an acting shop steward. Blair asked Bishop why he had refused an order to move. Bishop stated that he had been given no formal order to move, and that he would not transfer the glare problem to a co-worker by moving. Blair told Bishop that his job was in jeopardy if he did not move. Delaney and Rehm counselled Bishop to change positions, and Rehm advised Bishop to move and grieve the incident through union procedures. Bishop restated his refusal to move, and the meeting adjourned. At this point Bishop was unsure of what action management would take, but he believed he might be terminated.

Bishop then met with Jay Holtan and Marilyn Callahan, who worked in ATU's personnel department. Holtan and Callahan informed Bishop that management indeed intended to terminate Bishop for insubordination. They attempted to persuade Bishop that his refusal to move was unreasonable, and suggested that he seek counselling. Bishop insisted that his only desire was to fix the glare problem and proceed with his work; he denied that he was being unreasonable, and rejected the idea of counselling. The personnel staffers then suggested that Bishop take a week of leave as a "cooling off period." Bishop agreed to this, general manager Dale Merrell signed the appropriate leave forms, and Bishop left the building. On that same day, discharge papers were prepared and signed by Bishop's supervisor, the department head, and Merrell, but they were not presented to Bishop.

After leaving work, Bishop contacted Larry Johnson, a friend in a separate unit of ATU who had two years of experience as a union steward. Johnson set up a Monday meeting with general manager Merrell and

spoke with acting shop steward Rehm. Rehm said that the personnel office had told her that Bishop was experiencing "personal problems," that he had taken a week off work to undergo counselling, and that his employment status would be settled when those personal problems were resolved. Johnson told Bishop of this conversation, and Bishop reacted with anger, interpreting the comments as an attempt by ATU to disseminate rumors and smear his character.

Bishop immediately called the personnel office and informed Marilyn Callahan and Jay Holtan that rather than allow ATU to spread rumors about his mental health, he would return to work on Monday, and the parties could "finish what they started." A discussion of the subject with Holtan on Sunday did not change Bishop's decision. On Monday Bishop went to Holtan's office. An acting shop steward was summoned to the room, and Mel Ackerman, the personnel director, presented Bishop with a disciplinary action report (DAR). The DAR, which had been signed the previous Friday, stated that Bishop was terminated for gross insubordination—his failure to change work stations. Bishop was asked to sign the DAR; but refused, writing only a comment which stated that he believed termination to be an excessive punishment for a refusal to move, and denying that (as the DAR stated) he had said in the Friday meeting, "I won't move and you'll have to fire me." Bishop then cleaned out his desk, and left the building.

On Monday, July 30, Larry Johnson met with general manager Merrell about Bishop's termination. Johnson argued that Bishop was a fourteen-year employee with an unblemished record, and that he should not be fired over the work station dispute. Merrell said that Bishop's supervisor, Riley Blair, had made the termination decision, and that Merrell refused to intervene. Merrell explained that he had nothing against Bishop, but that he was simply going to "back his supervisor" in the dispute. He then stated that if he had wanted Bishop fired, he could have fired him over the letter-writing incident.

On Friday, August 3, Bishop's wife Terry, who also worked at ATU, met with Merrell.

She asked him whether anyone was "out to get" her husband. Merrell assured her that this was not the case, and then raised the subject of Bishop's letters to the local newspapers. Merrell explained how angry he had been about the letters and how much trouble Bishop had caused him by writing them. Merrell then commented, "and then there was this," referring to the dispute over Bishop's work station. Merrell stated that lower management personnel had asked him to sign discharge papers for Bishop on Friday the 27th, but that he had refused. Merrell said that instead of signing discharge papers, he had given Bishop a week of leave to reconsider his position.

Bishop filed a grievance through the union. In meetings between union officials and ATU managers, however, the parties could come to no agreement. The grievance then went to a union committee vote to decide whether to take the matter to arbitration. A committee of stewards voted unanimously to arbitrate the grievance, but then a second committee convened, and decided not to pursue the matter.

Bishop claims that his termination was the final step in a campaign of management harassment which began when he wrote the letters to the editor. Bishop filed suit in April of 1991. He stated seven claims in his complaint: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) wrongful discharge; (4) retaliatory discharge; (5) denial of free speech rights; (6) denial of due process; and (7) intentional infliction of emotional distress.

In April 1993 the superior court dismissed Bishop's wrongful discharge claim as repetitious of his contract claims, and granted ATU summary judgment as to the emotional distress claim. In July 1993 the court granted ATU summary judgment as to Bishop's remaining claims. The court later awarded $51,599.47 in attorney's fees and costs to ATU. This appeal followed.

## III. DISCUSSION

■ We consider Bishop's claims in light of the standard of review recently reiterated

in *Newton v. Magill,* 872 P.2d 1213 (Alaska 1994). This court

> will uphold summary judgment only if the record presents no genuine issues of material fact and "the moving party was entitled to judgment on the law applicable to the established facts." When the court makes this determination, "[a]ll reasonable inferences must be drawn ... in favor of the non-moving party."

*Id.* at 1215 (citations omitted).

## A. Bishop's Actions Constituted "Just Cause" for Dismissal

■ Bishop admitted in his deposition that he disobeyed direct orders to change his work station and move out of the glare. He contends, however, that ATU's order was unreasonable, and that his refusal to move concerned a trivial matter. From this premise Bishop argues that even if his refusal to change work stations were the true and only reason for his termination, his behavior did not constitute just cause for termination. He therefore asserts that his breach of contract claim should be reinstated.

■ As Bishop recognizes, it is the general rule in Alaska that "when an order given is reasonable and consistent with the contract, the failure to obey it is always a material breach as a matter of law." *Central Alaska Broadcasting v. Bracale,* 637 P.2d 711, 713 (Alaska 1981). The employment contract between Bishop and ATU was the collective bargaining agreement that was then in place between the ATU and Bishop's union. That contract stated that ATU could "direct its employees in an efficient manner" and could "take reasonable disciplinary action for just cause."

There can be no dispute that ATU's order that Bishop change places is consistent with its contractual power to "direct its employees in an efficient manner." The only remaining ground for argument under *Bracale* concerns the "reasonableness" of the order. Bishop argues that because the simplest solution to the problem was to let him tint the window at his own expense, ATU's approach to the situation was unreasonable, and that his refusal to obey the order did not justify discharge. To support this contention, Bishop has attempted to portray ATU as an irrational bureaucracy beset by turf battles, a place where the maintenance staff refuse to let individual employees solve simple problems, and where managers would rather uproot a four-desk work station than accept the free installation of a sheet of tinted plastic.

This argument, however, rests on a misinterpretation of Alaska law. The wisdom of ATU's approach to problem-solving is not a question for this court. Instead, we must rule on whether ATU's specific order to Bishop was reasonable. ATU's behavior in regard to the dispute over the glare may well be characterized as aggravatingly bureaucratic, but in light of the employer's contractual rights to "direct employees in an efficient manner," the decision to order Bishop to change seats cannot be termed an unreasonable solution to his complaints about glare.[2] *See, e.g. Bracale,* 637 P.2d at 714 (where board of directors had authority over personnel matters, their directive that the general manager should terminate an employee was reasonable as a matter of law, and general manager's failure to do so was cause for his own termination).

As a corollary to his main argument, Bishop contends that when a directive from an employer concerns trivial rather than substantial matters, disobedience does not justify discharge. Alaska law, however, does not support this proposition. *Bracale,* 637 P.2d at 713 n. 6 ("[Insubordination] 'though relating to a trivial matter and though causing no damage, will always justify immediate discharge.'") (quoting 9 H. Jaeger, Williston on Contracts § 1013B, at 49 (3d ed. 1967)).

---

2. An order to change positions with one's co-worker would certainly be unreasonable if the problem complained-of involved a threat to worker safety. *See, e.g., Wheeler v. Caterpillar Tractor Co.,* 108 Ill.2d 502, 92 Ill.Dec. 561, 485 N.E.2d 372 (1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 187 (1986) (employee wrongfully terminated after refusing to operate a unit containing live radioactive cobalt in violation of federal regulations). In the case of glare, however, this concern does not seem to be present. Bishop has offered no medical evidence that the glare put him at risk of injury.

Of course, if Bishop's insubordination were merely a pretextual reason for his termination, and Bishop was actually fired for some other, illegitimate reason, then his contract claim would have merit. As described below, however, based on the record, we cannot reasonably infer that this is the case.

B. *The Record Does Not Contain Genuine Issues of Material Fact Tending to Show that Insubordination Was Merely a Pretextual Reason for the Termination*

■ Bishop pursues a First Amendment claim, alleging that ATU management did not terminate him because of insubordination, but rather because of his letter writing. He also pursues a retaliatory discharge claim, alleging that he was fired because of his complaints to management and the union about the glare. ATU insists Bishop was terminated because, and only because, he repeatedly failed to obey an order to change work stations.

■ We first consider whether the record contains circumstantial evidence which might conceivably convince a trier of fact that Bishop's letters to the editor led to his termination. A three-part test applies in cases where the plaintiff makes an employment law claim that his or her First Amendment rights have been violated. The plaintiff must show that (1) (s)he engaged in protected activity, and (2) the activity was a "substantial" or "motivating factor" in the termination. This *prima facie* case can be rebutted, however, if (3) the employer demonstrates that the plaintiff would have been discharged even if the protected activity had not occurred. *Wickwire v. State*, 725 P.2d 695, 700 (Alaska 1986).

ATU has conceded that Bishop's letters to the editor fall into the category of "protected speech," but argues that Bishop cannot show that the letter-writing incident was a substantial or motivating factor in his termination.

Viewing the record in the light most favorable to the non-moving party, the facts most helpful to Bishop can be summarized as follows: (1) Bishop was a fourteen-year employee with an unmarred work record; (2) it had not been ATU's practice to terminate workers for insubordination; employees who were considered insubordinate were given lesser punishments; (3) general manager Merrell raised the letter-writing issue in post-termination meetings with Terry Bishop and Larry Johnson, and exhibited a defensiveness about his behavior in the firing which could be interpreted as the sign of a guilty conscience; and (4) Bishop's termination papers were signed after the Friday morning meeting prior to the "cooling off period," although they were not activated or delivered to him at that time.

We find no evidence in the record that would allow a jury to conclude that Merrell's role in Bishop's termination was anything other than a supervisor approving a decision made by lower management. The letter-writing incident that Bishop claims is at the root of his firing took place ten months prior to the termination. Bishop has produced no evidence that management was "out to get" him, and the reasons given by ATU management for Bishop's termination have never been contradictory. *Cf. Parker v. Mat–Su Council*, 813 P.2d 665, 667–68 (Alaska 1991) (summary judgment in favor of employer inappropriate when supervisor's explanation of employee's discharge differed from reasons given in termination letter).

Indeed, Merrell's approval of the "cooling off" period indicates that ATU was willing to retain Bishop even after his termination papers were drawn up. Had Bishop complied with the "cooling off period," and changed work stations, there is no indication that he would have been fired. In sum, we cannot infer from the record in this case that Bishop was fired for any reason other than that offered by ATU. We therefore affirm the order of summary judgment on the First Amendment claim.

A review of the numerous depositions in the record reveals that there is nothing to suggest that Bishop's termination was a punishment for complaining about work conditions or for bringing a union representative into the dispute. Bishop's brief often cites to the record in support of the retaliatory dis-

charge claim, but these record passages actually concern only the letter-writing issue.

Additionally, assuming for the sake of argument that Bishop's letter played a role in his termination, it is our view that reasonable jurors could only find that Bishop would have been fired even if the letter had not been written.

To reiterate, Bishop was given a reasonable order by his employer. He refused to follow it. He was told that he would be fired if he did not follow the order. He again refused to obey. Bishop was then given a week of leave as a cooling-off period. He declined to accept this leave, and again refused to follow the order.

No employer could be expected to continue to employ a worker in the face of such deliberate and repeated insubordination. Bishop was given clear notice of what was required of him and clear notice that he would be fired if he did not do what he was ordered to do. Nonetheless he declined. By this action, Bishop effectively fired himself. We thus conclude that the Municipality has demonstrated that Bishop would have been discharged even if the letter had not been written. On this ground as well, the superior court's summary judgment order as to the retaliatory discharge claim must be affirmed.

C. *The Record Does Not Support a Claim of Intentional Infliction of Emotional Distress*

■ This court evaluates summary judgment on an intentional infliction of emotional distress ("IIED") claim under the standard set out in *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985):

> [T]he trial judge should make a threshold determination whether the severity of the emotional distress and the conduct of the offending party warrant a claim of intentional infliction of emotional distress. . . . The judge's threshold determination on these issues will not be overturned absent an abuse of discretion.

■ Under Alaska law, there are three elements of an IIED claim: (1) the defendant's conduct is extreme and outrageous;

(2) the conduct is intentional or reckless; (3) the conduct causes severe emotional distress. *King v. Brooks,* 788 P.2d 707, 711 (Alaska 1990).

■ Because none of Bishop's other tort or contract claims can survive summary judgment, Bishop has not shown ATU's conduct to be extreme and outrageous; he therefore cannot meet the first prong of the *King v. Brooks* test. Our analysis need go no further to affirm the superior court's summary judgment on the IIED claim.

D. *Attorney's Fees Were Improperly Calculated Under the Old Form of Rule 82*

The new version of Alaska Civil Rule 82 became effective on July 15, 1993. It "govern[s] all civil actions and proceedings thereafter commenced and so far as just and practicable all proceedings then pending." Alaska R.Civ.P. 98 (1994). Summary judgment was entered for the defendants in this case on July 16, 1993, and ATU filed its motion for attorney's fees on July 29, 1993. Using the old Rule 82, the court awarded ATU fifty percent of its legal fees, for a total of $51,599.47 in fees and costs.

Bishop makes three arguments against the award of fees and costs to ATU: (1) he argues that the new version of Rule 82 should be used to determine the proportion of fees to be awarded; (2) he contends that the portion of fees resulting from delays in the trial date should not be awarded, because the delays were not the fault of the plaintiff; (3) he views the hours spent by ATU's attorneys to be excessive in several areas.

The issue of excessive hours may be summarily dispensed with, as the trial court did not abuse its discretion in refusing to reduce the award. *Integrated Resources Equity Corp. v. Fairbanks North Star Borough,* 799 P.2d 295, 304 (Alaska 1990).

■ With regard to the second issue, the trial date delays in this case occurred through the fault of neither party, but rather resulted from an overcrowded court docket. The lower court decided that "[trial continuances] and the need to reasonably refresh trial preparations, are part of the risk that a

plaintiff must accept when he brings suit." We agree with the analysis of the trial court. As ATU points out, if fees resulting from delays were granted special status, "the door is opened for attorneys to challenge every added expense that could be attributed to the court and not to the parties." The better view is to treat the fees that resulted from no-fault delays as a "cost of doing business."

 The final fees issue is whether to apply the old or the new version of Civil Rule 82. We have addressed this issue before in the context of Civil Rule 23:

Alaska's Civil Rule 23 was not revised to conform to the 1966 federal revisions until November 15, 1976. While this suit was filed at a time when former Civil Rule 23 was in effect, the new rule was properly applied to it by the trial court inasmuch as no questions of class action procedure were presented to the court until after November 15, 1976, and, under Civil Rule 98, newly promulgated rules govern "so far as just and practicable all proceedings then pending."

*Nolan v. Sea Airmotive, Inc.*, 627 P.2d 1035, 1041 n. 3 (Alaska 1981). *See also Fermoyle v. State*, 638 P.2d 1320, 1322 (Alaska App. 1982) (applying new rule of criminal procedure to pending case, under criminal equivalent of Civil Rule 98).

Since the instant case was in process when the new Rule 82 went into effect, Rule 98 dictates that the new Rule should govern here, so long as its application would be just and practicable. The lower court declined to apply the new Rule, concluding that it "work[s] a major modification of the parties' rights and expectations," and "[u]nder tradi-

tional fairness notions ... should enjoy prospective application only." We disagree. Under both the old and the new Rule, the fee awarded is ultimately determined at the discretion of the trial judge.[3] The change worked by the new version of the Rule is merely to provide a set of guidelines to aid the court in making its decision, and to require that variations from the baseline award—here twenty percent—be explained in writing. Applying the new Rule here would in no way be unjust or impinge on "traditional fairness notions." We therefore remand the fees issue to the superior court with the instruction to apply the new version of the Rule.

## IV. CONCLUSION

We AFFIRM the superior court's orders granting ATU summary judgment on all counts of Bishop's complaint.[4] We REMAND the issue of attorney's fees to the trial court for a determination of fees under the new Rule 82.

COMPTON, Justice, with whom RABINOWITZ, Justice, joins, dissenting in part.

In my view the record discloses the existence of genuine issues of material fact surrounding Anchorage Telephone Utility's (ATU) purported reason for terminating Stanley Bishop. These issues suggest that the professed reason for Bishop's termination was merely a pretext for punishing Bishop for having engaged in constitutionally protected activity. For this reason the superior court erred in granting ATU summary judgment. The judgment of the superior court

---

3. The old version of the Rule directed that "[s]hould no recovery be had, attorney's fees may be fixed by the court in its discretion in a reasonable amount." Alaska R.Civ.P. 82 (1992). The new version of the Rule provides that a prevailing party who recovers no money judgment in a case without trial shall be awarded twenty percent of its fees, but that this amount may vary "if, based on the factors listed [in 82(b)(3)], the court determines a variation is warranted." Alaska R.Civ.P. 82(b)(3) (1994).

4. The superior court granted ATU's motion to dismiss the wrongful discharge claim, agreeing with the defendants that this claim was repetitive

of the First Amendment and retaliatory discharge claims discussed above. In his brief, Bishop nowhere addresses the issue of repetition. Accordingly, this issue is waived. *Wirum & Cash Architects v. Cash*, 837 P.2d 692, 713–14 (Alaska 1992).

Bishop's complaint also claimed a breach of a covenant of good faith and fair dealing. Bishop does not discuss the covenant in his "Statement of Issues," and his brief contains a single, conclusory sentence on the topic, with no cited authority. He has therefore waived this issue. *Id.* The remainder of Bishop's "Issues on Appeal" either state no legal claim or are not briefed.

should be reversed and the case remanded to resolve the factual issues.

The court correctly notes that as this is an appeal from a grant of summary judgment, we must apply the standard of review recently reiterated in *Newton v. Magill*, 872 P.2d 1213 (Alaska 1994).

> [We] will uphold summary judgment only if the record presents no genuine issues of material fact and 'the moving party is entitled to judgment on the law applicable to the established facts.' When the court makes this determination, '[a]ll reasonable inferences of fact from proffered materials must be drawn against the moving party . . . and in favor of the non-moving party.'

*Id.* at 1215. (citaitons omitted.) *See* also *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) ("on summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion"). Under this

standard, we must reverse and remand the case for trial if Bishop can establish facts from which it reasonably might be inferred that his termination was in retaliation for exercising rights guaranteed him by the First Amendment to the United States Constitution.[1]

Bishop argues that the superior court overlooked evidence which supports his claim that he was terminated for writing letters to the editors of the *Anchorage Daily News* and *The Anchorage Times*. When the letters were written in September 1989, there was rancorous and substantial public debate over whether the Municipality of Anchorage (MOA), which owned ATU, should sell ATU to Pacific Telecommunications, Inc. (PTI). In the letters, Bishop criticized MOA Mayor Tom Fink and ATU management.

ATU argues that Bishop was terminated because of, and only because of, his insubordination, *i.e.* his refusal to obey an order to change work stations.[2]

---

1. Freedom of religion, of speech, of the press. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for redress of grievances.
U.S. CONST. amend. I.

2. Bishop's termination directly followed a dispute with ATU related to glare on his computer work screen. Bishop asked David Delaney, his foreman, to contact Building Services, also referred to as Building Maintenance or Facility Maintenance, and request that they correct the problem. Delaney claims to have called the "Building Maintenance people" and requested that they attend to the problem. After several months of silence, Bishop again complained. In early June Delaney submitted a work order to Building Maintenance specifically requesting the they "[i]nstall sunscreen on windows to reduce glare on CRTs." Under "Priority" Delaney checked "7 to 14 days." Bishop also complained to ATU Safety Coordinator Herbert E. Everett, who verified the glare: "And what it was, was the light was shining through the edge of the window onto the screen itself . . . Well, I thought that, yes, there was definitely sunlight coming through—around the edge of the shades, . . ." Everett thought "[i]t was a problem that needed to be addressed. . . ." He turned the matter over to Bud Murphy, Building Maintenance Supervisor, "to look into it and see what they could do about it . . . they ought to . . . eliminate the sunlight shining through the window on Mr. Bishop's screen." When Everett

learned from Bishop that nothing had been done, there was a meeting at Bishop's work station at which "they [Building Maintenance] agreed that yes, there was sunlight coming in . . . and that we needed to do something about it." Building Maintenance inexplicably refused to do anything about the glare.

Bishop offered to place visqueen over the window at his own expense. Supervisors over Bishop (Delaney, Riley Blair, Repair Service Supervisor, and Frank Biondi, Director of Utility Services) countered Bishop's proposed solution with several of their own. (Building Maintenance, apparently not under the jurisdiction of Bishop's immediate supervisors, was no longer a player.) One suggested solution was that Bishop change work stations with a fellow employee. According to Blair, this suggestion and the order to implement it came from Biondi, who was responsible directly to ATU General Manager Dale Merrell. Word was passed down to Delaney to move Bishop. As the following footnote documents, just what happened after that is a matter of dispute.

However, there is no dispute that there was glare on Bishop's work screen. There is no dispute that the glare was a problem for Bishop. There is no dispute that Delaney and Everett separately requested Building Maintenance to remove the glare from Bishop's work screen, and that Building Maintenance refused to do so. Since Bishop was willing to buy the visqueen and install it himself, ATU does not argue, nor could it, that the cost to ATU was too great. ATU does not argue that Bishop's proposed solution would not have cured the problem. ATU does not ar-

The court would be correct in concluding that had Bishop repeatedly refused[3] to obey a direct order, such refusal could amount to insubordination which might constitute just cause for his termination, if there was no question that the refusal was the only reason for Bishop's dismissal. *See* Opinion Section III, A. However, the existence of issues of fact which support both Bishop's and ATU's allegations make the disposition of this case on summary judgment inappropriate.

There are several elements to a wrongful discharge claim in which it is alleged that an employee's termination violated the First Amendment. To make out a *prima facie* case the employee must show that (1) he or she engaged in a protected activity, and (2) the activity was a substantial or motivating factor in the decision to terminate the employee. The employer can rebut the *prima facie* case by demonstrating that the employee would have been terminated, even if the protected activity had not occurred. *Wickwire v. State*, 725 P.2d 695 (Alaska 1986).

ATU does not dispute that Bishop engaged in protected activity. Indeed, ATU concedes that Bishop's letters to the editors qualify as protected speech. However, there are genuine issues of material fact as to the second element of Bishop's proof and ATU's rebuttal. There is support in the record for Bishop's allegation that because of the letter writ-

gue that Bishop's reasons for rejecting alternative solutions were not reasonable. However, ATU does argue that Bishop's refusal to change work stations constituted "gross insubordination."

3. The court's statement that Bishop was repeatedly insubordinate is not indisputably established by the record. The accounts of what transpired around the time of Bishop's termination vary dramatically and give rise to a variety of inferences. For example, Bishop and Delaney disagree on whether and when Delaney explicitly ordered Bishop to move. On Thursday, July 26, Delaney discussed with Bishop changing work stations. According to Bishop, Delaney only relayed to Bishop that he had been ordered to move Bishop: "He did not tell me ever directly, Stan, I want you effectively now, tomorrow, the day after or any other time to switch positions with Larry Taylor." This was not said at Bishop's work station, or even in the office, but rather when the two were returning from a personal errand. Delaney admits that he may have mentioned the move when he and Bishop were walking across the ATU parking lot returning from the errand. However, Delaney does claim that the next morning, Friday, July 27, he told Bishop to change work stations, and that Bishop refused. Bishop concedes that "I guess at this point I was refusing to move. I had not moved. I honestly expected someone to come in Friday morning [July 27] and tell me, Stan, take a seat over here. And it never really happened."

There are at least four different accounts of what happened that Friday morning, July 27. According to Bishop, when Delaney came in that morning and saw Bishop at his usual work station, Delaney may have said something about Bishop moving work stations. However, Bishop does not recall that Riley Blair, Delaney's supervisor, was present, nor does he remember saying he would not move and that they would have to fire him first. Delaney testified when asked what happened that he "[t]old him that he was suppose to change work stations with Larry. I told

him to go ahead and move that first thing in the morning.... He said he wasn't going to do it." Delaney says he then called Blair to tell him that Bishop had not moved. Although this testimony is in response to a question about what happened that Friday morning, it actually sounds like it is describing what happened the afternoon before. In a third account Larry Taylor, a fellow employee who worked next to Bishop, claims that on Friday morning Bishop was told to move during a confrontation with both Delaney and Blair, which took place in the Repair Service Bureau. He alleges that Bishop said "he wasn't going to move" with both Delaney and Blair standing there. Conversely, Blair does not recall discussing the move with Bishop until later that morning in a meeting at which Larry Taylor was not present.

At a hastily called meeting later that Friday morning, Bishop told Mel Ackerman that Delaney had never ordered him to move. Ackerman, described variously by the players as "our labor relations person," "the personnel director or whatever," the person "in charge of Human Resources," and "the head of Labor Relations," responded: "well, it doesn't make any difference because we're telling you right now to move." Bishop refused to move. Then, according to Carla Rehm, acting shop steward, "Mel Ackerman then spoke up and he just went over the whole scenario again, making sure that everybody was clear on what happened." Management, and Rehm, wanted to be certain that Bishop knew what he was doing, and that what he was doing might put his job in jeopardy. Bishop acknowledged that he understood.

Viewing the various versions of this episode, in a light most favorable to Bishop, the most that can be said is that Bishop simply stood by his initial refusal to move. Whether Bishop's behavior constitutes a "repeated" refusal to obey an order lies in the eye of the beholder, usually called a fact finder. What is clear is that no one ever admits to having told Bishop to move or be fired.

ing incident, ATU General Manager Dale Merrell either wanted him fired, or at least unreasonably refused to intervene in his termination.

Bishop's letters provoked an extraordinary response from ATU's management. Their publication prompted a meeting in General Manager Merrell's office, apparently called on his order. The meeting was attended not only by Bishop, but also by Riley Blair, Frank Biondi, Mel Ackerman, and Mike Bowman, Bishop's shop steward. Bishop was informed that Merrell had gotten numerous calls about the letters, some from "the Hill Building," or "downtown," which apparently was a reference to a call from Mayor Fink himself. Bishop was asked, or told, to explain himself and the letters, and was told by Merrell to show Merrell any future letters before they were sent to newspapers. Various participants in this meeting testified that Merrell had felt that the letters were directed at him and were indictments of him personally.

Although Bishop's letters had been published almost ten months prior to his termination, Merrell demonstrated a concern over the letters even *after* Bishop's termination. Following the termination, Merrell allegedly made unsolicited references to the letters in meetings with Terry Bishop, Bishop's wife, and Larry Johnson, a friend and fellow employee of Bishop's who had been a shop steward.[4] As this court paraphrases the record, Merrell stated to Johnson that "if he [Merrell] had wanted Bishop fired, he could have fired him over the letter-writing incident,"[5] and explained to Terry Bishop "how angry he [Merrell] had been about the letter, how much trouble Bishop had caused him by writing it, then commented, 'and then there was this,' referring to the dispute over Bishop's work station."

In addition to Merrell's comments about the letters, Merrell allegedly told Terry Bishop that he had refused to sign discharge papers the previous Friday, July 27, when asked by his subordinates to do so. This statement is patently false. Merrell in fact did sign discharge papers that day, allegedly at the request of Blair and other subordinates. Nevertheless, he told Terry Bishop that instead of signing discharge papers, he had given Bishop a week to reconsider his position. Indeed Merrell had approved a week's leave, but only *after* he had signed discharge papers.[6]

**4.** The court's treatment of the time lapse between Bishop's letters and Merrell's complicity in Bishop's termination highlights the problem of disposing of this case on summary judgment. In an affidavit, Merrell remarks that "[a]fter the meeting with Stan [regarding the newspaper articles], I put the matter behind me. I am not the type to carry a grudge, and cannot recall that we ever discussed the letter again." Yet Terry Bishop and Larry Johnson both stated that Merrell voluntarily alluded to the newspaper articles when they discussed Bishop's termination with him, ten months after the letters had been published. Merrell does not recall mentioning the letters to Terry Bishop. However, he does not deny that he did, and in fact claims to think "very highly" of Terry Bishop. He does not believe she would lie. He does not dispute Johnson's statement.

Although the court acknowledges Merrell's defensiveness concerning the letters, the court emphasizes the time lapse in "find[ing] no evidence in the record that would allow a jury to conclude that Merrell's role in Bishop's termination was anything but a supervisor approving a decision made by lower management." However, regardless of the time lapse, the record contains evidence which give rise to issues of material fact. The record reveals that Merrell was defensive about the letters *and* associated the letters with Bishop's plight. A reasonable trier of fact might have difficulty reconciling Merrell's forgive and forget self-characterization with his self-generated defensiveness over the articles, and his tying together the articles and the dispute over the work stations, *i.e.* "then there was this."

**5.** Merrell's statement that he could have fired Bishop over the letter writing incident is patently incorrect. ATU concedes that Bishop was engaged constitutionally protected activity when he wrote the letters. However, ten months later the letters are still on Merrell's mind, and he was still in denial regarding Bishop's right to voice his opinion through the letters.

**6.** The record demonstrates that two members of the personnel staff, Jay Holtan and Marilyn Callahan, then an employee relations representative, intervened on Bishop's behalf. According to Callahan, "Jay and I happen to like [Bishop]." They suggested to Bishop that he take a week's leave of absence as a "cooling off period," a recommendation to which Bishop agreed. They then took the suggestion to Merrell, who apparently agreed also, as he signed appropriate leave papers that day. However at the time he signed the leave papers he had already signed Bishop's termination papers.

The court claims that had Bishop complied with the "cooling off" period, he would never

Merrell's preoccupation with the letters and his less than truthful statements to Terry Bishop constitute evidence from which it reasonably might be inferred that Bishop's letters to the editors were a substantial or motivating factor in Merrell's decisions regarding Bishop's termination. Even Blair, the person who initiated and signed Bishop's termination papers, seems to have questioned the whole situation. Terry Bishop alleges that when she asked Blair whether there was a conspiracy which led to Bishop's termination, he replied that he "was wondering the same thing."

There are also issues of material fact regarding ATU's required rebuttal of Bishop's *prima facie* case. The record contains evidence from which it reasonably might be inferred that Bishop would not have been fired but for the letters. Keeping in mind that the facts must be viewed in light of all of the circumstances surrounding Bishop's termination, which necessarily include circumstances surrounding publication of the letters and the meeting that occurred in the immediate aftermath of that protected activity. The circumstances surrounding Bishop's termination look something like the following: Bishop had been employed by ATU for fourteen years, during which time he had presented no disciplinary problems. ATU did

not terminate employees for insubordination, but instead meted out lesser sanctions. ATU General Manager Merrell had been angered over Bishop's "letter[s] to the Editor" which had been published in two Anchorage newspapers, and had called an extraordinary meeting with Bishop and Bishop's superiors in the aftermath of the letters. After Bishop had been terminated, Merrell apparently had no reservations about telling falsehoods to or misleading Terry Bishop about his own role in Bishop's termination. Merrell had continuing and unresolved anger over Bishop's letters, as well as a lasting conviction that Bishop could have been terminated for writing the letters. One of his own subordinates questioned whether there was a conspiracy to terminate Bishop. Merrell, as ATU General Manager, was in a position of authority over all the other players. Last, and perhaps most importantly, Merrell had the final authority over whether Bishop was to be disciplined, and what that punishment was to be.

All of this reasonably might give rise to the inference that Bishop was terminated for writing the letters. A trier of fact reasonably might conclude that but for the protected activity, Bishop would not have been terminated, or would have received a sanction

have been terminated. This is not supported by the record. The discharge papers necessary for terminating Bishop had been completed, including Merrell's signature, before Merrell signed the leave papers. It is unclear what was motivating Merrell to give Bishop the leave of absence. Merrell claims that he signed the termination papers because he wanted to support his subordinate's decision to terminate Bishop. Yet this same subordinate, Riley Blair, testified that he was angered by Merrell's decision to sign the leave papers because he felt like management had "left [him] out on a limb." A reasonable trier of fact might find it difficult to harmonize Merrell's assertion that he was just supporting his subordinate's decision to terminate Bishop with going over that subordinates head and declining to terminate Bishop, unless one or both of Merrell's assertions are false.

However, the record does establish that *after* Bishop left the building, starting his "cooling off period," Larry Johnson talked with Bishop a second time. Johnson relayed to Bishop information he had received from Carla Rehm, who told him that word was going around that Bishop was being given time off because he was going through a mid-life crisis, had personal problems,

or words conveying that notion. The record suggests that this word emanated from Frank Biondi's office. It must be remembered that Biondi had been present at the post-publication meeting in General Manager Merrell's office. Biondi, according to Blair, gave the order that Bishop change work stations. Biondi did not ever delve into the merits of Bishop's complaint or his proposed solution. Biondi was directly responsible to Merrell.

Bishop was very upset that his credibility was being undermined by such statements from management, and abandoned the "cooling off period." There is evidence that Bishop felt that he was being set up to be terminated. The record could give rise to this inference, considering that it contains a discrepancy as to whether Bishop had been fired, was suspended, or was on a leave of absence.

A trier of fact could conclude, as does the court, that Bishop had not been terminated and would not have been had he complied with the leave of absence. However, a trier of fact could also conclude that Bishop effectively was terminated before the leave papers were signed and that the leave was merely for appearance sake.

other than termination. As *Newton* requires that we draw all reasonable inferences in favor of the non-moving party, Bishop, we must infer that Bishop's termination over the work station change order was pretextual, and that Bishop's protected activity was a motivating or substantial factor in his termination. *See Newton,* 872 P.2d at 1215.[7]

Underlying this court's decision is a weighing and balancing of evidence, and reasonable inferences which might be drawn from that evidence. Some of this evidence points to Bishop's exercise of constitutionally protected activity as a substantial or motivating factor in his termination. Other of this evidence weighs in favor of ATU's assertion that it was not, or even if it was, that Bishop would have been terminated over the work station change order anyway. Arguably the court may reasonably conclude that the weight of the evidence and inferences favors ATU. However, that weighing is an exercise that goes beyond the court's standard of review of a grant of summary judgment.

7. ATU incorrectly argues that summary judgment is appropriate even though there is a question as to whether Bishop's letters to the editor were a motivating factor in his termination. ATU contends that summary judgment is appropriate because it established that Bishop would have been discharged notwithstanding the protected activity. This argument is merely the other side of the inquiry into whether Bishop's protected activity was a motivating factor in his dismissal. If Bishop's proffered evidence is sufficient to survive summary judgment with regard to the "motivating factor" criteria, that evidence must also suffice to prevent ATU from rebutting Bishop's *prima facie* case in the context of a motion for summary judgment.