Ray T. **BRIGGS** and Gilbert
D. Shea, Appellants,

v.

Alvin **NEWTON** and William Christensen, d/b/a **R & R Plumbing**
and Heating, Appellees.

No. S–8375.

Supreme Court of Alaska.

Aug. 13, 1999.

---

16. 899 P.2d 133 (Alaska 1995).

17. 856 P.2d 477 (Alaska 1993).

18. 704 P.2d 205 (Alaska 1985).

19. *B.E.B. v. R.L.B.*, 979 P.2d 514, 520 (Alaska 1999).

Ray T. Briggs and Gilbert D. Shea, pro se, Palmer.

Jerald M. Reichlin, Fortier & Mikko, P.C., for Appellee Alvin Newton.

No appearance by Appellee William Christensen, d/b/a R & R Plumbing and Heating.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

### OPINION

FABE, Justice.

## I. INTRODUCTION

In this appeal, two contractors, Ray Briggs and Gilbert Shea, claim that William Christensen interfered with their contractual relationship with business owner Jim Hess and made defamatory statements about them to Hess. The superior court granted summary judgment in favor of Christensen for three reasons: (1) Briggs lacked standing because the suit belonged to his bankruptcy estate and could only be brought by the trustee; (2) the interference claim was collaterally estopped by a district court's finding in a prior suit that Briggs and Shea breached their contract with Hess; and (3) Christensen's comments, though defamatory, were privileged. We affirm.

## II. FACTS AND PROCEEDINGS

In August 1991 Jim Hess entered into an oral contract with Ray Briggs to remodel Hess's business, the Anchorage Auction Company. According to Hess, he and Briggs agreed on a flat rate of $6,500 for Briggs's work. Briggs hired another contractor, Gilbert Shea, to assist him; the two worked on the job for approximately one week. At the end of the first week, Briggs and Shea presented a bill to Hess for that week's work. Hess refused to pay based on his understanding that they had signed a fixed price contract. Briggs and Shea immediately discontinued their remodeling work.

Briggs and Shea claim that, after they began the remodeling work, Hess insisted they use William Christensen, d/b/a R & R Plumbing and Heating (R & R), to help them install a new furnace for Hess even though Christensen did not have a license to do furnace work. Hess had known Christensen for ten years and had worked with him previously.

ously. According to Briggs and Shea, they were forced to terminate their work for Hess rather than illegally hire an unlicensed subcontractor.

After Briggs and Shea left the project, Hess contracted with Christensen to complete the construction for $3,500. Christensen later gave Hess a written summary of the job that estimated the actual cost to him of completing the work to be about $5,200. Christensen wrote to Hess that he felt "the job was purposely [underbid by Briggs] in order to obtain it, with the intention of going for more money [halfway] through the project." He claimed he "finished [the] job not for a profit but more from a concern that Jim and Virginia Hess had an office to work with, as everything was left in such a mess when [Briggs] walked off his job."

In August 1991 Briggs reported to the City of Anchorage Building Permits Division that Christensen was performing furnace work for Hess that was beyond the scope of Christensen's city contracting license.[1] In response, the City placed a stop work order on the project. Hess then entered into a contract for $3,500 with Superior Plumbing and Heating to complete the installation of forced air ducting and a new furnace.

Later in 1991, Briggs and Shea filed a small claims action against Hess for the cost of labor and materials for the construction work they did complete on the barn.[2] Hess filed a counterclaim against Briggs and Shea for the additional costs of completing the job. The case was eventually moved to district court. After a bench trial in January 1993, District Court Judge John R. Lohff concluded that:

(1) the oral contract between Briggs and Hess was a fixed price contract for $6,500;

(2) the contract called for Briggs and Shea to upgrade Hess's existing heating system using furnaces provided by Hess;

(3) Briggs and Shea breached their contract with Hess by discontinuing work on the project;

---

**1.** In January 1992 Christensen was charged with three counts of submitting bids and working as a contractor and plumber without a license from 1990 to 1992.

**2.** See Briggs v. Hess, Nos. 3AN–92–2155/2156 CI (Consolidated) (Alaska Dist.Ct., November 17, 1993).

(4) although Hess could recover for costs incurred in finishing the project, Briggs and Shea could offset that recovery with the cost of their labor; and

(5) many of Briggs' and Shea's assertions were "highly suspect and of dubious veracity" and, thus, neither Briggs nor Shea were entitled to costs or attorney's fees.

Judge Lohff determined that Briggs was entitled to a net judgment against Hess of $240 and that Shea was entitled to $840. The superior court affirmed Judge Lohff's ruling.

In July 1992, while the district court suit was pending, Briggs filed a voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code.[3] In his petition, Briggs listed his lawsuit against Hess's Anchorage Auction Company as personal property with a value of $3,217.49.

One week after Briggs filed his petition for bankruptcy, Briggs and Shea filed a complaint against Christensen and the previous owner of R & R, Alvin Newton[4] (collectively, Christensen), alleging intentional interference with their contract with Hess. Briggs and Shea also claimed that Christensen's statements to Hess about their work performance were defamatory.

Superior Court Judge Eric Smith granted summary judgment to Christensen in September 1997 on both the interference and defamation claims. `Judge Smith held that, because the district court judge had found in *Briggs v. Hess* that Briggs and Shea breached their contract with Hess, they were collaterally estopped from claiming in this case that Christensen interfered with their contract with Hess. Although Judge Smith concluded that Christensen made defamatory comments to Hess about Briggs and Shea, he

also concluded that the "business relationship" privilege protected such comments. Finally, Judge Smith decided that Briggs lacked standing because the lawsuit was an asset of the bankruptcy estate and, thus, the only proper plaintiff was the bankruptcy trustee. Briggs and Shea appeal.

## III. STANDARD OF REVIEW

We will uphold a grant of summary judgment only if no genuine issue of material fact exists in the record and the moving party is entitled to judgment as a matter of law.[5] When we make such a determination, we draw all reasonable factual inferences in favor of the non-moving party.[6]

 The applicability of collateral estoppel to a particular set of facts is a legal question over which we exercise independent review.[7] The issues of whether a party has standing and whether a statement is defamatory are also legal questions. To resolve them, "we apply our independent judgment and adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[8]

## IV. DISCUSSION

A. *Briggs Lacks Standing Because the Suit Belongs to His Bankruptcy Estate.*

 Christensen contends that because Briggs's claims against R & R are part of Briggs's bankruptcy estate, only the bankruptcy trustee has standing to raise the claims. We agree. Briggs's bankruptcy estate includes any cause of action belonging to him at the time he filed his petition for bankruptcy under 11 U.S.C. § 541.[9] When a

---

3. See 11 U.S.C. §§ 701–766.

4. Newton had previously owned R & R under the name R & R Plumbing and had entered into an agreement to sell the business to Christensen in August 1988. According to Newton, Christensen never completed payments on the sale. Newton testified in *Briggs v. Hess* that he and Christensen were in a type of "partnership." The exact nature of their business relationship remains a disputed issue that the superior court chose not to resolve.

5. See *Bishop v. Municipality of Anchorage*, 899 P.2d 149, 153 (Alaska 1995) (citation omitted).

6. See *id.*

7. See *State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 950 (Alaska 1995).

8. *State, Dep't of Transp. & Pub. Facilities v. Sanders*, 944 P.2d 453, 456 (Alaska 1997).

9. 11 U.S.C. § 541(a)(1) provides that the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." See also *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 754 (Alaska 1992).

debtor's assets include causes of action, the bankruptcy trustee becomes the proper plaintiff to pursue those claims; only the trustee has standing to pursue causes of action that now belong to the estate.[10]

Briggs counters that the superior court may not dismiss the suit because federal courts have exclusive jurisdiction over bankruptcy proceedings. But this "exclusive jurisdiction" argument is irrelevant. Federal courts have exclusive jurisdiction over "all cases under title 11" of the United States Code,[11] as well as original—but not exclusive—jurisdiction over other civil cases "arising under title 11, or arising in or related to cases under title 11." [12] In turn, the case law analyzing the meaning of the terms "arising under" and "related to" generally concerns the limits on *federal* jurisdiction over such related civil cases.[13] Thus, Briggs's argument proves, at most, that a federal court *could* exercise jurisdiction over his related contract claim.[14]

∎ Because we conclude that Briggs lacks standing, we now must determine what the appropriate procedural remedy should be. Generally, "[w]hen a third party tries to assert an action still vested in the trustee,

the court should dismiss the action." [15] But some courts have allowed the bankruptcy trustee to substitute for the debtor as the real party in interest and to continue litigating the case without dismissal and refiling of the case.[16]

∎ Here, the superior court held that, "[a]t a minimum, then, [Briggs's] case must be dismissed as to Mr. Briggs without prejudice. . . ." In light of our conclusion that Shea's claims are legally meritless, we believe that dismissal without prejudice of Briggs's claims is a more suitable remedy than a remand for substitution of the bankruptcy trustee as plaintiff. Thus, the remainder of our opinion reviewing the superior court's grant of summary judgment applies only to Shea and his claims against Newton and Christensen.

### B. Shea Failed to Raise a Genuine Issue of Material Fact on His Interference Claim.

∎ The superior court agreed with Christensen that because the district court in *Briggs v. Hess* ruled that Briggs and Shea breached their contract with Hess, the doctrine of collateral estoppel precludes asser-

**10.** See *Bohna,* 828 P.2d at 754 (citing *Hanover Ins. Co. v. Tyco Indus. Inc.,* 500 F.2d 654, 657 (3d Cir.1974)); *see also Price v. Gaslowitz (In re Price),* 173 B.R. 434, 440 (Bankr.N.D.Ga.1994) ("[A] debtor may not unilaterally prosecute a claim that belongs to the estate."); *Dorr, Keller, Bentley & Pecha v. Dorr, Bentley & Pecha,* 841 P.2d 811, 816 (Wyo.1992) ("All causes of action . . . may *only* be brought by the trustee after the petition in bankruptcy is filed.").

**11.** 28 U.S.C. § 1334(a).

**12.** 28 U.S.C. § 1334(b).

**13.** *See, e.g., AMW Cable Co., Inc. v. McCray,* 209 B.R. 410, 413–14 (Bankr.N.D.Miss.1997); *Boyajian v. DeLuca,* 180 B.R. 365, 368 (Bankr.D.R.I. 1995). *See generally* 28 U.S.C.A. § 1334(b) annots. 47, 48 (1993 & West Supp.1998).

**14.** The superior court's statement that Alaska courts have jurisdiction over Briggs's case because it "certainly is related to the bankruptcy proceeding" is thus inaccurate.

Even if the "related to" test applied here, most courts have found that a debtor's breach-of-contract and tortious interference cases are sufficiently "related to" bankruptcy proceedings as to

be within the scope of the district court's original jurisdiction. *See, e.g., Hughes–Bechtol, Inc. v. Construction Management, Inc.,* 132 B.R. 339, 343 (Bankr.S.D.Ohio 1991) (holding that debtor's breach-of-contract suit was "related to" bankruptcy case because potential recovery could alter debtor's rights or liabilities). And at least one court has held that a debtor could not enjoin a state breach-of-contract suit when the federal court merely had concurrent, not exclusive, jurisdiction over the case. *See Florida Precast Concrete, Inc. v. City of Orlando,* 139 B.R. 37, 38–39 (Bankr.M.D.Fla.1992).

**15.** *In re Perkins,* 902 F.2d 1254, 1258 (7th Cir. 1990); *see also Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.),* 785 F.2d 1249, 1253–54 (5th Cir.1986); *Mitchell Excavators, Inc. v. Mitchell,* 734 F.2d 129, 131–32 (2d Cir.1984).

**16.** *See, e.g., Cottrell v. Schilling (In re Cottrell),* 876 F.2d 540, 543 (6th Cir.1989) (granting a motion to substitute trustee's counsel in the suit rather than dismissing the case); *Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir. 1988) (holding that because debtor lacked standing, court properly substituted trustee as plaintiff).

tion of an interference claim against Christensen. But a party in breach may under certain circumstances bring a subsequent independent claim for contractual interference against a third party.[17] Thus, we decline to adopt the superior court's reasoning that a party in breach may never sue a third party for contractual interference.

 We believe that summary judgment was nonetheless appropriate because, as Christensen argued in his motion for summary judgment, Shea failed to raise a genuine issue of material fact as to whether Christensen intentionally interfered with Briggs and Shea's contract with Hess.[18] To sustain an interference claim, a plaintiff must show that "(1) a contract existed, (2) the defendant ... knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified." [19]

 Based on a reading of the initial complaint and the opposition to Christensen's motion for summary judgment, Shea sets forth two different theories in support of his interference claim. First, he claims that Christensen interfered with the relationship between Briggs and Shea and Hess by "advising [Hess] that the work performed by [them] was negligently performed." But Christensen made the allegedly defamatory statements to Hess *after* Briggs and Shea breached their contract with Hess by walking off the job, in an attempt to explain why the actual cost of finishing the work was higher than Briggs and Shea's bid. Logically, if Christensen made the comments after the breach, then Christensen could not have induced the breach by making such comments.

Shea's alternative theory is that Christensen "directly conspired to induce a [breach]" by entering into a contract with Hess before Briggs and Shea quit the job in order to force Briggs and Shea to abandon the project and take the job for himself. But the record does not support this theory. Instead, all the evidence presented to the superior court suggests that Christensen was not competing with Briggs and Shea but rather was retained by Hess to assist them and that Christensen agreed to complete the unfinished work for Hess only *after* Briggs and Shea breached their contract with Hess. The district court in *Briggs v. Hess* found that Christensen "was to assist in the project" along with Briggs and Shea.[20] Hess also testified in *Briggs v. Hess* that he asked Christensen to perform a cost estimate on the project *prior to* Hess hiring anyone, including Briggs and Shea, to do the furnace work and that Christensen "had some other jobs going" and had no intention of bidding for the project himself. Shea does not refute this testimony.

Shea also presents no evidence that Christensen contracted with Hess to perform the project that Briggs and Shea were in the process of completing. On the contrary, the bill for Christensen's services makes clear that Christensen was to finish the office work that Briggs and Shea left behind for a flat fee of $3,500. After Briggs and Shea breached their contract with Hess, Christensen gave Hess a summary of job costs documenting that the actual cost of the project was $5,200. But he only charged Hess $3,500,

17. The Restatement (Second) of Torts defines "intentional interference with another's performance of his own contract" as follows:

One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him. Restatement (Second) of Torts § 766A (1979). *See also Plattner v. State Farm Mut. Automobile Ins. Co.,* 168 Ariz. 311, 812 P.2d 1129, 1133–34 (App.1991) (allowing attorney to bring an inter-

ference claim against a third party for forcing him to breach his contract with his client).

18. We may affirm a superior court's grant of summary judgment on any grounds. *See Ward v. Lutheran Hosp. & Homes Soc'y of Am., Inc.,* 963 P.2d 1031, 1034 (Alaska 1998).

19. *RAN Corp. v. Hudesman,* 823 P.2d 646, 648 (Alaska 1991) (citation omitted).

20. Shea does not dispute this finding. Indeed, he used it to argue in the opposition to Christensen's motion for summary judgment that Christensen knew about the contract.

presumably the original amount he was to receive for assisting Briggs and Shea with the furnace work. This job summary squares with Christensen's response to a request for admission that he "agreed to finish the cosmetic portions of the remodel for a sum of $3,500.00 so the auction could resume business."

Shea attempts to use Christensen's assistance on the project as a means of justifying the breach of the contract with Hess. Shea reasoned in his opposition to Christensen's summary judgment motion that

> [r]egardless of the intent of [Christensen,] if ... installation of a gas furnace by R & R was a part of [Briggs and Shea's] contract, then the performance of any alleged contract became illegal, [Briggs and Shea] could not complete the project, and not only had every right, but [were] required by law to cease work.

But the district court in *Briggs v. Hess* nonetheless found that Briggs and Shea had breached their contract with Hess. Although the court in *Briggs v. Hess* did not explicitly address what motivated Briggs and Shea to breach the contract, it did note that they walked off the job immediately after Hess refused to pay them for a week's work because of his understanding that the contract was for a fixed price.

 Because of the district court's findings in *Briggs v. Hess*, Shea is now collaterally estopped from raising new defenses to the breach or arguing that a breach did not occur. A party may invoke nonmutual offensive collateral estoppel when the doctrine is asserted against the same party as in the previous action, when the issue to be precluded is identical to that in the first action, and when the issue was resolved by a final judgment on the merits in the first action.[21] Here, Christensen would be asserting the doctrine against the same parties as in the first action—Briggs and Shea. The issue that Briggs and Shea sought to relitigate—whether they breached their contract with Hess— was identical to that in the first action. And

the district court's ruling in *Briggs v. Hess* was final and on the merits.

In short, the fact that Christensen may have misrepresented his licensing status to Hess and began assisting with furnace work prior to Briggs and Shea's completion of the project for Hess is insufficient as a matter of law to sustain an interference claim against Christensen. Shea offers no evidence that Christensen intended to induce a breach of the contract with Hess; he relies on conduct that occurred *after* he and Briggs breached their contract with Hess by walking off the job. Thus, the superior court properly granted summary judgment on the interference claim.

### C. Shea Failed to Raise a Genuine Issue of Material Fact as to Whether Christensen's Statements Were Defamatory and Unprotected by Privilege.

Shea next claims that Christensen made several defamatory statements about him and Briggs to Hess. Christensen submitted a job summary sheet to Hess in which he described the scope of the project and attempted to explain why the cost of finishing the project would probably exceed Briggs and Shea's original bid. In this document, Christensen wrote that Briggs's work was of low quality and that Briggs's job "was purposely [underbid] in order to obtain it, with the intention of going for more money [halfway] through the project." Christensen maintains that such statements are not defamatory or, in the alternative, that they are protected by the "business interest" privilege.

 To prove that a statement is defamatory, a plaintiff must show:

> (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either "per se" actionability or special harm.[22]

"A communication is defamatory if it tends to harm the reputation of another so as to lower him [or her] in the estimation of the commu-

---

**21.** *See Rooney v. Rooney*, 914 P.2d 212, 215–16 (Alaska 1996).

**22.** *French v. Jadon, Inc.*, 911 P.2d 20, 32 (Alaska 1996).

nity or to deter third persons from associating or dealing with him [or her]."[23] Drawing all reasonable factual inferences in favor of Shea, we agree with the superior court's conclusion that Christensen's comments about Briggs and Shea's work performance could be considered defamatory.

But we also agree with the superior court that, even if Christensen's comments were defamatory, Shea cannot maintain a defamation claim because the statements were privileged. "One who publishes defamatory matter concerning another is not liable for the publication if: (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused."[24] We have acknowledged two types of conditional privileges: when the media prints items of public interest and when a person "having a common interest in a particular subject matter believes that there is information that another sharing the common interest is entitled to know."[25] Specifically, we have recognized a conditional privilege based on either a joint business interest[26] or an employee/employer relationship[27] when a statement is made "for the protection of a lawful business, professional, property or other pecuniary interest."[28] The defendant has the burden of asserting the privilege.[29]

Here, Christensen met that burden. As he explained in his motion for summary judgment, Christensen's statements were part of a document Christensen created to explain to Hess the scope and cost of finishing the job Briggs and Shea began. Christensen's speculations as to why Briggs's bid was so low could reasonably be construed as a means of justifying the relatively high costs of finishing the project, thereby protecting Christensen's business interest in the project.

The business privilege is clearest "when a legal relationship exists between the defendant and the person on whose behalf he intervenes."[30] Here, Christensen and Hess had a contractual relationship and had been doing business together for years. Thus, Christensen "could reasonably have thought [Hess] should be informed of [Christensen's] dissatisfaction with [Briggs and Shea's] performance."[31]

The question thus becomes whether Christensen abused the business privilege. A conditional privilege may be abused if the defendant acted with malice—if he had "knowledge or reckless disregard as to the falsity of the defamatory matter" or if the matter is "not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged."[32] In making this determination, we look to whether the speaker had a reasonable belief in the truth of the statement.[33] "Ordinarily, once a defendant establishes the existence of a privilege the plaintiff has the burden of showing that it has been abused."[34]

Christensen argued in his motion for summary judgment that no evidence was produced to demonstrate any malice on his part. We agree. An examination of the allegedly defamatory document reveals that Christensen tempered his comments with the admission that he was not present for the original bid and that his comments merely reflected his personal opinion. Shea has

23. *Id.* (alterations in original) (citation omitted).

24. *Schneider v. Pay'N Save Corp.,* 723 P.2d 619, 623 (Alaska 1986) (quoting Restatement (Second) of Torts § 593 (1977)).

25. *Id.* at 623–24 (citing *Lull v. Wick Constr. Co.,* 614 P.2d 321 (Alaska 1980)) (internal quotation marks omitted).

26. *See Lull,* 614 P.2d at 324.

27. *See Schneider,* 723 P.2d at 624.

28. *Id.* (discussing and adopting comments to Restatement (Second) of Torts § 595).

29. *Id.*

30. *Schneider,* 723 P.2d at 624.

31. *Lull,* 614 P.2d at 324.

32. *Id.* at 624–25 (quoting Restatement (Second) of Torts § 599 cmt. a (1977)).

33. *See id.* at 625.

34. *Id.* at 624.

pointed to no evidence, other than the document itself, to establish that Christensen knew his statements were false or that he acted recklessly with respect to their falsity. In *Lull v. Wick Construction Co.,*[35] we found a lack of malice as a matter of law under very similar facts. In *Lull,* a subcontractor, The Crowning Touch, brought a defamation suit against its general contractor, Wick Construction, because Wick communicated to The Crowning Touch's bank and bonding company about Wick's dissatisfaction with The Crowning Touch's performance on a particular project.[36] We held that Wick had not abused the business privilege and was entitled to judgment as a matter of law on the defamation claim:

> [T]he evidence ... reveals no indication that the communications from Wick to the bank and bonding company were made with malice.... The letter, copies of which Wick sent to the bank and bonding company, did not go beyond stating that Wick was taking over the contract because of nonperformance by The Crowning Touch, and listing the particular instances of nonperformance of which Wick accused The Crowning Touch.[37]

Just as The Crowning Touch presented no evidence that Wick's accusations were malicious, Shea has provided no indication that Christensen's comments were made with malice. Under these circumstances, the superior court did not err in its grant of summary judgment to Christensen on the defamation claim.

## V. *CONCLUSION*

Because the trustee for Briggs's bankruptcy estate is the only proper plaintiff to bring Briggs's substantive claims, we AFFIRM the superior court's dismissal of Briggs's claims without prejudice on standing grounds. Because Shea failed to raise a genuine issue of material fact as to whether Christensen intentionally interfered with Briggs and Shea's contract or whether Christensen's allegedly defamatory comments were protected by the business privilege, we also AFFIRM the su-

perior court's grant of summary judgment to Christensen on those claims.

---

**35.** 614 P.2d 321 (Alaska 1980).

**36.** *See id.* at 322–23.

**37.** *Id.* at 324–25 (footnote omitted).